KWANG DONG PHARMACEUTICAL
CO.

v.

Myun Ki HAN, Ph.D.

No. CIV.A.DKC2001–2453.

United States District Court,
D. Maryland.

June 12, 2002.

Patrick J. Kearney, Foley and Lardner, Washington, DC, David R. Lipson, Jeffrey W. Kilduff, O'Melveny and Myers LLP, McLean, VA, Daniel E. Farrington, O'Melveny and Myers LLP, Washington, DC, for Plaintiff.

Steven K. Hoffman, James and Hoffman PC, Washington, DC, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this breach of contract case is the motion of Counter–Defendant, Kwang Dong Pharmaceutical Co. ("Kwang Dong" or "KD"), to dismiss Counts I, II, III, IV, and VII of the counterclaim of Counter–Plaintiff, Dr. Myun Han ("Han"), pursuant to Fed.R.Civ.P. 12(b)(6). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be granted in part and denied in part.

## I. Background

The following facts are alleged in Defendant's counterclaim.[1] Dr. Myun Ki Han was employed as an Assistant Professor of Biochemistry at Georgetown University ("Georgetown") beginning in August, 1992. Prior to his employment with Georgetown, Han was a staff fellow at the National Institutes of Health ("NIH") and held a Visiting Assistant Professorship in The Johns Hopkins University Department of Biology. Han also pursued scientific research in Biochemistry and Molecular Biology during this period. Han published his work in distinguished scientific journals, successfully competed for research grants, and made research advances in his field.

In 1996, Han was introduced to Kwang Dong by a KD business consultant. Shortly thereafter, Mr. Soo Boo Choi ("Choi"), Chairman of KD, began discussions with Han and Georgetown officials, including Jack Hartman, Director of the Office of the Dean of Research and Graduate Education; Dr. Eugene Davidson, Chairman of the Department of Biochemistry; and Carol Tracy Carr, Director of the Office of Technology Transfer, regarding a collaborative project to research and develop drugs for the treatment of liver diseases and AIDS. KD agreed to fund the

---

1. The complaint filed by Kwang Dong against Han alleges conversion, fraud and fraudulent inducement, breach of good faith and fair dealing, and breach of contract.

research Han was going to conduct at Georgetown. In November 1996, an agreement between the parties was imminent and, as a good faith gesture, KD placed $100,000 in an account at its Korean bank under Han's name, but controlled by KD. Between late 1996 and early 1997, John Burris, Associate Dean for Research Operations at Georgetown, and Choi signed a ten-year Research Agreement. Han signed the agreement as well, serving as the Principal Investigator on the contract and as a third-party beneficiary of the agreement. KD agreed to make $4,200,000 in quarterly payments over ten years to support the research specified in the Agreement, while Georgetown and KD concurrently entered into an Exclusive License Agreement permitting KD to market and sell the products of Han's research. KD knew that Han depended on its funding as the principal financial support for his position at Georgetown. Han asserts that KD had no intention of fulfilling its obligations under either Agreement.

In February 1997, KD made its first payment under the Research Agreement. To compensate Han for his expenses, KD deposited the advance of $55,000 into Han's Korean account that contained the commitment fee. In April 1998, KD directed Han to use the money in the KD Korean account to purchase KD stock in order to boost its stock price. However, KD wanted Han's sister, a prominent Korean physician, to purchase the stock in order to attract and influence other investors. KD transferred the funds for the stock purchase to Han's sister.

To ensure that Han would continue with the research project, even if he left Georgetown, KD proposed, and Han agreed to, a Supplemental Agreement on April 4, 1997. In the Supplemental Agreement, Han agreed to take the necessary steps to establish a research and licensing agreement between KD and any new institution he might join under the same terms as the Agreements with Georgetown. In addition, Han agreed to file patent applications for any products relating to the Research Agreement, to which KD retained global licensing rights, and obligated Han to pursue patent applications in China and Korea relating to research products. As consideration, KD promised Han a 2% royalty upon the commercialization of any drugs or dietary supplements related to his research and agreed to reimburse Han for any expenses incurred from negotiating licensing rights with China. Han again asserts that KD had no intention of honoring this agreement at the time it entered into it.

Shortly thereafter, KD began to pressure Han to speed up his research and it asked Han to agree to a research schedule more compressed than that set forth in the Research Agreement. In exchange, KD would accelerate its support payments. However, KD never accelerated the payments and actually fell behind on its preexisting payment obligations. In an effort to inflate the value of its stock, KD issued several Korean press releases in August 1997, reporting that KD had actually developed an AIDS drug, in collaboration with Georgetown, further claiming that the drug was in pre-clinical trials and would be subject to clinical trials in 1998. KD knew these statements were untrue and the press releases directly violated KD's Research Agreement with Georgetown, which required prior written permission to use Georgetown's name in any publicity connected with the research project.

After the press releases were issued, KD increased pressure on Han to accelerate his work in order to conduct the pre-clinical and clinical trials as it had predicted. On January 24, 1998, KD convinced Han to enter into an "Acceleration Agree-

ment" where Han agreed to use his best efforts to continue his research towards drug development and shorten the time for the commercialization of any products arising from the research. As consideration, KD agreed to convey to Han 5,000 shares of stock by the end of June 1998 and an additional 5,000 shares by the end of June 1999. Again, Han asserts that KD had no intention of fulfilling its obligations under this agreement. Han fulfilled his obligations under the Agreement, but received none of the consideration promised.

KD entered into separate agreements with individual researchers and provided additional funding outside of the Research Agreement to keep Han's laboratory operating virtually around the clock, although it had fallen in arrears in its obligations to Georgetown and never accelerated its payments to the University. As a result of this schedule, Han received several patents based on his work and KD gained valuable licenses to use the patent material Han developed. On June 20, 1998, Han entered into a third agreement with KD relating to his work on a "Fluorometric Assay for Detecting Nucleic Acid Cleavage" where Han would receive 50% of the royalties collected from sublicensees or successful patent litigation in exchange for his patent achievement. KD also agreed to pay Han $25,000 by December 31, 1998, for his continued assistance regarding the use of this new technology. Once again, Han asserts KD had no intention of fulfilling its obligations under this agreement and, although Han met all of his obligations, KD failed to provide any of the consideration it agreed to provide. In addition, KD attempted to persuade Han to help it escape its financial obligations to Georgetown under the Research Agreement, but maintain its rights under the Exclusive License Agreement. Han refused to cooperate with KD in this endeavor.

Meanwhile, Georgetown began to complain to KD about KD's failure to meet its funding obligations under the Research Agreement and its Exclusive License Agreement. Georgetown eventually threatened to terminate the Research Agreement and Exclusive License Agreement. A meeting between KD and Georgetown to discuss the threatened termination took place on June 22, 2000. There, KD arranged for Han to be excused from the meeting and then falsely accused him of taking research money for his own use and not meeting research schedules, knowing these accusations were false and for the purpose of undermining Han's position at Georgetown and saving its licensing rights. As a result of these accusations and KD's failure to fund Han's research as promised, Georgetown terminated Han's appointment in the summer of 2000.

## II. Standard of Review

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Comet Enters. Ltd. v. Air–A–Plane Corp.*, 128 F.3d 855, 860 (4th Cir.1997). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, ——, 122 S.Ct.

992, 998, 152 L.Ed.2d 1 (2002), *quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir.1997). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal conclusions, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.1979).

### III. Analysis

Plaintiff/Counter–Defendant KD has moved to dismiss Counts I, II, III, IV, and VII of Defendant/Counter–Plaintiff Han's counterclaim on the ground that he has failed to state a cause of action adequately. Han replies that he has adequately stated the claims in question so dismissal under Rule 12(b)(6) would be improper or, in the alternative, the counterclaims should be dismissed without prejudice so Han can amend them.[2]

### A. Choice of Law

 When jurisdiction is based on diversity under 28 U.S.C. § 1332(a)(2), the court applies Maryland's choice of law rules to determine which substantive law

applies. For tort actions, Maryland generally adheres to the *lex loci delecti commissi*, or place of harm, to determine the applicable law. *See First Union Nat'l Bank v. New York Life Ins. and Annuity Corp.*, 152 F.Supp.2d 850, 854 (D.Md.2001); *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 231 (2000). "The place of injury has further been defined as the place where the last act required to complete the tort occurred." *First Union Nat'l Bank*, 152 F.Supp.2d at 854.

Han's Counterclaim does not specifically allege where he was harmed by KD's tortious conduct, but KD assumes two possible jurisdictions—Han's home state of Maryland or the District of Columbia ("D.C."), the home of Georgetown University. KD asserts that, under both Maryland and D.C. law, Counts I, II, III, IV & VII should be dismissed, because Han has failed to allege adequately the essential elements of those claims in either jurisdiction. In his opposition to KD's motion to dismiss, Han inexplicably does not state which law he believes applies, but instead responds that he has adequately pled his tort claims under both Maryland and D.C. law. As the meeting that led to Han's termination from Georgetown took place at Georgetown, in D.C., it appears likely that D.C. law governs Han's claims. However, because KD's complaint and a portion of the counterclaim remain, it is not necessary to resolve the applicable law issue at this time.

### B. Counts I & II—Fraudulent Misrepresentation

 The elements of a fraud claim in both D.C. and Maryland are: (1) a false representation regarding a material fact;

---

**2.** A Rule 12(b)(6) dismissal is with prejudice unless the court specifically orders dismissal without prejudice, which is within the court's discretion. *Carter v. Norfolk Comm. Hosp. Assoc. Inc.*, 761 F.2d 970, 974 (4th Cir.1985).

Han has requested an opportunity to amend his counterclaim and KD has not yet answered. Therefore, any counts which are to be dismissed, where amendment would not be futile, will be dismissed without prejudice.

(2) known to be false when made or made with reckless indifference to the truth; (3) for the purpose of deceiving or defrauding the person claiming injury; (4) that action was taken in reliance upon the misrepresentation, and the person had a right to rely upon it; and (5) that actual damage was suffered resulting from the misrepresentation. *See Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534, 537 (1982); *Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 577 (D.C.1981). Counter–Defendant KD asserts that Han has not pled any facts implying that KD had no intention of fulfilling the promises that it was making and characterizes Han's fraud claims as "bald allegation[s] of fraud with no supporting facts." *Sims v. Ryland Group, Inc.*, 37 Md.App. 470, 378 A.2d 1, 3 (1977). *See also Cassidy & Pinkard, Inc. v. Jemal*, 899 F.Supp. 5, 9 (D.D.C.1995), citing *Soper v. Simmons Intern., Ltd.*, 632 F.Supp. 244, 249 (S.D.N.Y. 1986) ("[D]efendants correctly argue that 'mere failure of promised performance has never permitted a factual finding that *defendants* never intended to perform' ").

■ Han responds that he alleged "a fully reticulated fraud scheme" where the fraudulent contracts were only a part. Therefore, he asserts that he has alleged sufficient facts. Paper No. 16, pp. 11–12. However, Han's counterclaims do not contain anything more than his assertion that KD had no intention of honoring the contracts at the time they were entered. Paper No. 6. Failure to perform a contract does not convert a breach of contract into fraud. *See Sims*, 378 A.2d at 3. In addition, fraud must be pled with particularity under Fed. R. Civ. P. 9(b). ("In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with

particularity"). Han has failed to allege any specific facts, only his general assertions that KD never intended to honor the Agreements it signed with Han. Accordingly, Counts I & II of Han's Counterclaim will be dismissed for failure to state a claim.

**C. Count III—Tortious Interference with Contractual Relations**

■ Han argues that he had an employment contract with Georgetown, therefore his employment was not at-will. However, Han never states that he had tenure at Georgetown.[3] KD argues that Han has failed to state a claim for tortious interference with contractual relations under either D.C. or Maryland law in part because his employment with Georgetown, albeit pursuant to contract, was at-will.

■■ In Maryland, "in the absence of a contract for a definite term, an employee is considered an at-will employee." *Gwinn v. Food Lion*, 195 F.Supp.2d 728, 730 (D.Md.2002). The same is true in D.C., where if "there is no clear expression of an intent to enter into a contract for a fixed period, we recognize a presumption that 'the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party.' " *Bible Way Church v. Beards*, 680 A.2d 419, 432–33 (D.C.1996), citing *Sullivan v. Heritage Foundation*, 399 A.2d 856, 860 (D.C.1979). Han has not asserted that he had a contract for a fixed or definite period. Rather he merely asserts he had an employment contract, which does not mean that he was not terminable at-will. As Han has failed to allege facts sufficient to overcome the presumption that employment contracts in Maryland

---

**3.** Han refers twice in his opposition to "tenure" but is referring to a period of time, not academic tenure. Paper No. 16, pp. 1 & 6.

and D.C. are at-will, his claim of tortious interference with contractual relations will be analyzed as an at-will employment contract.

■ Han is unsuccessful if D.C. law is applied. In D.C., an at-will employee does "not have a contractual employment relationship [he] could use as the basis for a suit for tortious interference with a contractual relationship." *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C.2000), *citing Bible Way*, 680 A.2d at 432–33.

■ In Maryland, "[a] broader right to interfere with economic relations exists where ... a contract terminable at will is involved." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663, 674 (1984). The elements of the tort are: (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiff; (3) done to cause damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) damage resulting. *Natural Design*, 485 A.2d at 675. "To establish tortious interference with prospective contractual relations, it is necessary to prove both a tortious intent and improper or wrongful conduct." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112, 119 (1994). "A plaintiff may prove tortious intent by showing that the defendant intentionally induced the ... termination of the contract in order to harm the plaintiff or to benefit the defendant at [plaintiff's] expense." *Id.* Defamation may satisfy the elements of tortious intent. To assert a *prima facie* case of defamation in Maryland:

> a plaintiff must ... establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.

*Gohari v. Darvish*, 363 Md. 42, 767 A.2d 321, 327 (2001) (internal citations omitted). Han has adequately asserted a defamation claim against KD in his counterclaim by alleging that KD falsely told Georgetown that Han had misappropriated research money for his own use and had not met his research schedule, that KD knew these statements were false, and that Han suffered harm through the loss of his job. Therefore, he has sufficiently alleged an underlying tortious act in support of his tortious interference with business advantage claim. Accordingly, KD's motion to dismiss Count III is denied under Maryland law.

### D. Count IV—Tortious Interference with Prospective Business Advantage

■ Next, KD argues that Han failed to state a claim for tortious interference with prospective business advantage under either Maryland or D.C. law because there was no lost business expectancy. Han replies that he had "every expectation of continuing at Georgetown and advancing to a more prestigious position either at Georgetown or at another institution of comparable quality." Paper No. 16, pp. 18–19.

■ The elements of the alleged tort are similar in Maryland and D.C.. In D.C., "[t]o survive a motion to dismiss for intentional interference with prospective business advantage, 'a plaintiff must allege "business expectancies, not grounded in present contractual relationships, but which are commercially reasonable to expect."'" *Sheppard v. Dickstein, Shapiro, Morin, & Oshinsky*, 59 F.Supp.2d 27, 34 (D.D.C.1999), *citing Democratic State Comm. of the District of Columbia v. Bebchick*, 706 A.2d 569, 572 (D.C.1998) (quoting *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)). "Expectancies" are "future contractual relations, such as the prospect of

obtaining employment." *Carr*, 395 A.2d at 84. Han has not pointed to any specific contractual relations that KD allegedly interfered with. His claim rests on his characterization of himself as having a bright future, his current and previous positions, and his publications. However, Han does not point to one specific employment prospect in support of his claim. Vague references to a promising future career are not enough to support a tortious interference claim under *Carr* and *Sheppard*. Therefore, Han has failed to state a claim under D.C. law for tortious interference with prospective business advantage.

In Maryland, tortious interference with prospective advantage is not a separate tort from tortious interference with business relationships. *Medical Mut. Liab. Ins. Soc'y v. B. Dixon Evander and Assocs.*, 331 Md. 301, 628 A.2d 170, 171 (1993). Han is already asserting a claim of tortious interference with business relationships so to allow this claim would be duplicative. Accordingly, Defendants' motion to dismiss Count IV will be granted with prejudice, as amendment would be futile.

### E. Count VII—Unjust Enrichment

Finally, KD argues that Count VII alleging unjust enrichment ought to be dismissed because the parties' relationship was governed by contract. Han responds that an unjust enrichment claim will lie, even if an express contract exists, if there is evidence of bad faith or fraud.

Both D.C. and Maryland hold that unjust enrichment claims are barred where an express contract exists, which Han does not dispute. *See United States v. EER Systems Corp.*, 950 F.Supp. 130, 133 (D.Md.1996) (holding that unjust enrichment is an "inappropriate claim[]" when there is an express contract"); *Schiff v. AARP*, 697 A.2d 1193, 1194 (D.C.1997)

("there can be no claim for unjust enrichment when an express contract exists between the parties"). In Maryland, courts may allow a unjust enrichment claim where there is a contract if there is evidence of fraud or bad faith. *See County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 747 A.2d 600, 608–09 (2000). However, this requires the plaintiff to plead fraud or bad faith in the formation of the contract that would otherwise govern. *See R.J. Wildner Contracting Co. v. Ohio Turnpike Comm'n*, 913 F.Supp. 1031, 1043 (N.D.Oh. 1996). Because the court has already determined that Han did not adequately plead fraud, there can be no fraud exception to the rule banning unjust enrichment claims. Therefore, Han has failed to state a claim for unjust enrichment. Accordingly, KD's motion to dismiss Count VII will be granted with prejudice, as amendment would be futile.

### IV. Conclusion

For the foregoing reasons, Counter–Defendant KD's motion to dismiss Counts I, II, and a portion of Count III will be granted, without prejudice to amendment. KD's motion to dismiss Counts IV and VII will be granted with prejudice. A separate order will follow.

### ORDER

In accordance with the accompanying Memorandum Opinion, IT IS this ___ day of June, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Counter–Defendant Kwang Dong Pharmaceutical to dismiss Counts I, II, III, IV, and VII of Counterplaintiff's Counterclaim pursuant to Fed. R.Civ.P. 12(b)(6) BE, and the same hereby

IS, GRANTED in part and DENIED in part;

2. Counts I, and II BE, and the same hereby ARE, DISMISSED without prejudice pursuant to Fed.R.Civ.P. 12(b)(6);

3. Count III BE, and the same hereby IS, DISMISSED if District of Columbia law applies;

4. Counts IV and VII BE, and the same hereby ARE, DISMISSED with prejudice pursuant to Fed.R.Civ.P. 12(b)(6);

5. Plaintiff is granted 15 days within which to file a motion for leave to amend his claims; and

6. The Clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties.