Victor ONYEOZIRI, Appellant,

v.

Jordan M. SPIVOK, et al., Appellees.

No. 10–CV–104.

District of Columbia Court of Appeals.

Argued Nov. 10, 2010.

Decided May 24, 2012.

280

Jon A. Hoppe for appellant.

James J. Fournier and Jordan M. Spivok were on the brief for appellees.

Before OBERLY, Associate Judge, RUIZ, Associate Judge, Retired,* and NEBEKER, Senior Judge.

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status

RUIZ, Associate Judge, Retired:

Victor Onyeoziri appeals from the Superior Court's grant of summary judgment in favor of appellees Jordan M. Spivok and Phillip J. Collins, who were trustees on a deed of trust for appellee Branch Banking & Trust Company (BB & T). On appeal, Onyeoziri argues that the court erred by granting summary judgment to appellees on his statutory claims under the federal Truth in Lending Act and the District of Columbia Home Loan Protection Act, and on his common law claim of tortious interference with business relations. We affirm the grant of summary judgment on the statutory claims, but reverse and remand with respect to the tort claim.

## I. Facts

In 2000, Onyeoziri purchased a house in the District of Columbia at 3108 35th Street, NE. He used it as his primary residence until some time in January 2001, when he began to rent it. In January 2006, in exchange for a "business/commercial" loan, Onyeoziri executed a promissory note to BB & T in the amount of $125,000, secured by a second deed of trust on the property.[1] When he executed the note, Onyeoziri alleged, he was unaware of the "balloon" nature of the transaction.[2] In January 2007, when the balloon payment became due, BB & T and Onyeoziri agreed to modify the note, extending the payment terms and thereby deferring the balloon payment due date for another year.[3] When the extended balloon payment fell due and Onyeoziri was unable to pay, the parties again agreed, in July 2008, to modify the note; Onyeoziri and BB & T executed a forbearance agreement, in which BB & T agreed not to foreclose on the property at that time in exchange for an assignment of Onyeoziri's life insurance policy. The forbearance agreement contained an exculpatory clause,[4] which provided that the loan "is not subject to the federal Consumer Credit Protection Act (15 U.S.C. § 1601 et seq.) nor any other feder-

changed to Associate Judge, Retired, on September 1, 2011.

1. The property also had a first deed of trust in the amount of $158,000. At oral argument, appellant's counsel indicated that both deeds were held by BB & T.

2. "A 'balloon note' is, '[a] note requiring small periodic payments but a very large final payment.' BLACK'S LAW DICTIONARY 1162 (9th ed. 2009). If, for example, a loan is amortized over a 30–year period but has only a 15–year term, a substantial amount of principal will remain at the end of the 15th year. In such a case, the lender will require that the principal be paid off in a lump sum with the final payment. The final payment, called a 'balloon payment,' is 'much larger than the preceding regular payments and ... discharges the principal balance of the loan.' Id. at 1243." Cerda v. 2004–EQR1, L.L.C., 612 F.3d 781, 790 n. 14 (5th Cir.2010) (alteration in original).

3. The principal plus accrued interest became due in full at maturity on January 28, 2008, with accrued interest payable monthly, starting on February 28, 2007.

4. The exculpatory clause also included a release of claims:

In the event borrower has any claims, actions or causes of action, defenses, counterclaims or set-offs of any kind or nature as of the date hereof which they now or hereafter may assert against the lender in connection with the making, closing, administration, collection and/or the enforcement by the lender of the aforesaid loan documents, excluding this agreement or any related agreement, then by executing this agreement, borrower forever irrevocably waives and relinquishes, remises, acquits, and forever discharges the lender by reason of any act, cause, matter or thing whatsoever existing or done to the date of this agreement. The term "lender" shall include, but shall not be limited to, its present and former officers, directors, employees, agents, and attorneys.

al or state disclosure or consumer protection laws." Onyeoziri did not make payment in accordance with the modified note and further efforts to resolve the outstanding obligation were unsuccessful. BB & T commenced default proceedings on the note by sending a notice to Onyeoziri of its intent to sell the property at a foreclosure auction on June 23, 2009.

On June 22, 2009, the day before the scheduled foreclosure sale, Onyeoziri filed in Superior Court a complaint for injunctive relief, a motion for a temporary restraining order, and a motion for a preliminary injunction to stop the foreclosure sale. At the hearing on the motion, Spivok told the court that on May 12 he had sent notice of the foreclosure sale to Onyeoziri by certified mail. Onyeoziri, however, testified that he never received the notice because he was traveling abroad, and first became aware of the foreclosure while reading a May 27 letter from Spivok he received on June 17, upon his return from Nigeria. Onyeoziri alleged in his complaint and testified in court that on June 2, while on a month's travel to Nigeria, he had entered into a contract to sell the property that served as collateral for the note. Onyeoziri presented a copy of the contract to sell the property, at a purchase price of $280,000 with a closing date of August 30, and a letter dated June 8 from Homestead Funding Corporation, licensed by the Virginia State Corporation Commission, prequalifying the buyer for a loan in the amount of $274,928. The trial court denied Onyeoziri's motion for a temporary restraining order, finding that there was no likelihood of irreparable harm because "any damage at issue here is monetary damage" for which Onyeoziri had "a remedy at law." The next day, June 23, the property was sold to BB & T, the sole bidder at the auction, for $59,000.

On July 1, 2009, Spivok moved under Rule 12(b)(6) to dismiss Onyeoziri's complaint, arguing that the injunctive relief Onyeoziri sought was moot because the property had been sold, and that Onyeoziri had failed to join Collins and BB & T as defendants. Onyeoziri argued in opposition that any failure to join the parties could be cured by an amendment to his complaint, thus making dismissal unwarranted. The court denied Spivok's motion to dismiss.[5]

On October 13, 2009, Onyeoziri filed an amended five-count complaint against Spivok, Collins, BB & T, and Metro Settlements, Inc.[6] Count One asserted a violation of the federal Truth in Lending Act (TILA), alleging that BB & T and Metro Settlements did not provide Onyeoziri with a TILA Statement or explain the "balloon note" to him, ultimately causing him to default on the note. Count Two alleged a violation of the District of Columbia Home Loan Protection Act (HLPA), alleging that the terms of the BB & T balloon note violated the statute. Count Three asserted a violation of the District of Columbia Mortgage Lender and Broker Act, alleging that BB & T improperly securitized the balloon note by taking Onyeoziri's life-insurance policy as collateral for a balloon

5. Onyeoziri also pointed to a purported discrepancy that "calls into question whether [Spivok] and Mr. Collins properly attained standing as substitute Trustees to sell the Property they advertised at auction," and argued that there is "a genuine issue of material fact to be determined in this matter before title to the Proper[t]y can lawfully pass either to the purchaser at auction or to the purchaser under the Plaintiff's contract of sale." This became Count Four of Onyeoziri's amended complaint. •

6. Metro Settlements, Inc. conducted the closing on the second deed of trust. Metro Settlements did not enter an appearance of counsel and did not file a brief before this court.

payment period extension. Count Four alleged that Spivok and Collins lacked standing to sell Onyeoziri's property at auction, as substitute trustees, and, therefore, could not pass title to BB & T. Count Five asserted that BB & T, Spivok, and Collins interfered with Onyeoziri's business relations by refusing to allow Onyeoziri to close on his contract to sell the property to his prospective buyer. Onyeoziri requested damages of $280,000 (the price at which he had negotiated the sale of the property), in addition to attorney's fees and costs.

On November 20, 2009, appellees moved to dismiss the amended complaint or, alternatively, for summary judgment.[7] On December 18, 2009, Onyeoziri filed an opposition.[8] On December 31, 2009, the trial court issued a cursory order granting appellees' motion for summary judgment.

Onyeoziri appeals the trial court's entry of summary judgment on Counts One, Two and Five; he does not appeal entry of summary judgment on Counts Three and Four.

## II. Standard of Review

We review a grant of summary judgment *de novo*. *See Molla v. Sanders*, 981 A.2d 1197, 1199 (D.C.2009). We, therefore, undertake an independent review of the record under the same standard applied by the trial court in its consideration of the summary judgment motion.[9] *See Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983). Our role "is not to act as factfinder and to resolve factual issues," but rather to review the record to determine if there is "a genuine issue of material fact on which a jury could find for the non-moving party."

7. Appellees' motion argued that Count One was barred by the statute of limitations; Count Two was barred because BB & T is federally regulated and thus exempt under HLPA; Count Three was barred because this was a commercial loan exempt from the D.C. Mortgage Lender and Broker Act; Count Four was barred because BB & T stands in privity with Onyeoziri; and Count Five fails because notice of the foreclosure was given before Onyeoziri entered into the contract for sale. Further, the motion argued that Onyeoziri was barred from recovering against BB & T because the forbearance agreement's exculpatory clause waived Onyeoziri's claim and released BB & T from liability.

8. Onyeoziri's opposition argued that the TILA claim was not time-barred because the period was tolled by the collection action; the HLPA exemption BB & T claimed was illusory in that another statutory section "recapture[d]" BB & T's liability; the nature of the loan— whether a consumer or commercial loan— was a genuine question of material fact requiring discovery to determine Onyeoziri's intended use of borrowed funds; summary judgment was inappropriate because the complaint alleged a prima facie case for tortious interference with business relationship; and the forbearance agreement's exculpatory

clause was limited to negligence, and did not disclaim liability for intentional torts.

9. Because appellate review of summary judgment is *de novo*, trial courts are not obligated to make detailed findings and conclusions in deciding a motion for summary judgment. *See Summers v. Department of Justice*, 140 F.3d 1077, 1079 (D.C.Cir.1998) ("[I]n our review of decisions granting summary judgment we must decide the same question that was before the district court.... For that reason, we normally do not require the district court to make findings of fact or conclusions of law in support of orders granting summary judgment."). Yet, where, as here, appellees posited several reasons in support of their motion for summary judgment, the court's reasoning for granting summary judgment would have been helpful in our review. *See Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 395 n. 5 (D.C.1991) ("Although Rules 52(a) and 56 of the Superior Court's Civil Rules do not by their terms require the trial judge to articulate his reasons for granting summary judgment, an explanation of the basis for the court's decision in doing so is desirable. This is especially true where, as here, the motion was based on several discrete grounds."). In this case the trial court gave no reasons for its decision.

*Id.* at 814–15. The moving party has the burden of demonstrating that there is no genuine issue of material fact, after the evidence and all inferences from the evidence are drawn in favor of the non-moving party. *See id.* at 815. "We will affirm the entry of summary judgment if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Id.* at 814 (quoting Super. Ct. Civ. R. 56(c)). If there are disputed issues of material fact, "summary judgment must be reversed, and trial held on the disputed issues." *Molla*, 981 A.2d at 1200.

## III. Statutory Claims

### A. *Truth in Lending Act*

■ Onyeoziri contends that the Superior Court erred in granting summary judgment on Count I, which alleged a TILA violation. We agree with the trial court's grant of summary judgment to appellees on this count. Onyeoziri could not pursue a TILA claim because TILA applies only to loans secured by the borrower's principal dwelling and does not apply to commercial loans.[10]

TILA does not apply to "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes," 15 U.S.C. § 1603(1) (2006), or to "[c]redit transactions, other than those in which a security interest is or will be acquired in real property, or in personal property used or expected to be used as the principal dwelling of the consumer and other than private education loans ... in which the total amount financed exceeds $50,000." *Id.* § 1603(3).[11] Thus, TILA's plain language makes clear that the statute applies "only to credit transactions secured by real or personal property used or expected to be used as the principal dwelling of the debtor. Credit transactions secured by real or personal property used for *other* purposes, such as commercial rental property, fall outside the scope of TILA's coverage." *Antanuos v. First Nat'l Bank*, 508 F.Supp.2d 466, 471 (E.D.Va.2007) (granting summary judgment to bank on TILA claim because property used to secure credit transaction was not plaintiff's primary dwelling).[12] Here, the evidence taken in the light most favorable to Onyeoziri establishes that TILA does not apply to the loan between Onyeoziri and BB & T.

10. Appellees also argue that the court correctly granted summary judgment on the TILA claim because it was barred by the statute of limitations and the forbearance agreement's exculpatory clause. Appellant contends that the statute of limitations had been tolled and the forbearance agreement's exculpatory clause was unenforceable as a matter of public policy. We do not reach these arguments because we conclude that TILA does not apply to Onyeoziri's loan.

11. At the time of Onyeoziri's note, the total amount financed had to exceed $25,000.

12. *See Hood v. Aurora Loan Servs.*, No. CCB–10–11, 2010 WL 2696755, at *2 n. 4 (D.Md. July 6, 2010) (finding that the plaintiff—in addition to being time-barred—failed to state a claim under TILA because the property at issue was investment property); *Jones v. Lu-*

*thi*, 586 F.Supp.2d 595, 615 (D.S.C.2008) ("TILA applies only to credit transactions secured by real or personal property used or expected to be used as the principal dwelling of the debtor. Credit transactions secured by real or personal property used for *other* purposes, such as commercial rental property, fall outside the scope of TILA's coverage." (quoting *Antanuos*, 508 F.Supp.2d at 471))); *Laporte v. Wells Fargo Bank, N.A.*, No. 3:08–CV–376, 2009 WL 2146324, at *2 (E.D.Tenn. July 14, 2009) ("[I]n order for TILA to afford any relief to the plaintiffs, the property secured by the loan must be their principal dwelling. TILA specifically exempts credit transactions other than those where the security interest relates to real property to be used as the borrower's principal dwelling." (citing 15 U.S.C. § 1603(3)).

Onyeoziri testified at the hearing on his motion for a temporary restraining order that he has not used the property as his primary dwelling since 2001, and his attorney specifically represented to the court during the hearing that Onyeoziri was using the residence as rental property. In addition, the note itself unambiguously indicates the nature and purpose of the transaction, stating that Onyeoziri "represents that the loan evidenced hereby is being obtained for 'business/commercial' purposes." Based on undisputed facts that the note was commercial in nature and secured by a deed of trust on property that is not Onyeoziri's principal dwelling, TILA does not apply to the transaction at issue here. *See* 15 U.S.C. § 1603(1), (3).[13]

## B. *District of Columbia Home Loan Protection Act*

■ We come to the same conclusion with respect to Count II: The loan transaction between Onyeoziri and BB & T does not come within the terms of HLPA.

HLPA prohibits a lender from making "a covered loan that provides for a scheduled payment that is more than twice as large as the average of earlier scheduled monthly payments unless the balloon payment becomes due and payable not less than 7 years after the date of the loan closing." D.C.Code § 26–1152.13 (2011 Supp.). Not all loans with balloon payments are covered by HLPA, however. For purposes of the statute, a "covered loan" is:

a mortgage loan, secured by property located in the District ... in which the terms of the mortgage loan exceed one or more of the following thresholds:

(i) The loan is secured by a first mortgage on the borrower's principal dwelling and the annual percentage rate at closing will exceed by more than 6 percentage points the yield on United States Treasury securities having comparable periods of maturity to the loan maturity measured as of the 15th day of the month immediately preceding the month in which the application for the residential mortgage loan is received by the creditor;

(ii) The loan is secured by a junior mortgage on the borrower's principal dwelling and the annual percentage rate at closing will exceed by more than 7 percentage points the yield on United States Treasury securities having comparable periods of maturity to the loan maturity measured as of the 15th day of the month immediately preceding the month in which the application for the residential mortgage loan is received by the creditor; or

(iii) The origination/discount points and fees payable by the borrower at or before loan closing exceed 5% of the total loan amount.

*Id.* § 26–1151.01(7)(A). In addition, the statute provides that if a loan is made by a federally regulated bank, it will be deemed a "covered loan" only if it meets the definition of "mortgage" in TILA. *Id.* § 26–1151.01(7)(B).[14] TILA defines "mortgage"

---

13. Onyeoziri's bald assertions in his pleading that the loan was not commercial and that it was secured by his primary dwelling—and that discovery is necessary to develop these facts—are insufficient to defeat summary judgment. *See Anthony v. Okie Dokie, Inc.,* 976 A.2d 901, 905 (D.C.2009) ("The party opposing the motion 'may not rest upon the mere allegations contained in its pleadings, but must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Potts v. District of Columbia,* 697 A.2d 1249, 1251 (D.C.1997))). Onyeoziri should not need discovery with respect to the use to which he puts his property.

14. Section 26–1151.01(7)(B) provides:

[I]n the case of a loan made or purchased by the Federal National Mortgage Associa-

as "a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan." 15 U.S.C. § 1602(bb)(1).

As with Onyeoziri's TILA claim, his HLPA claim is barred by the plain statutory language because the note was a business loan secured by Onyeoziri's rental property. *See Phrasavang v. Deutsche Bank,* 656 F.Supp.2d 196, 204 (D.D.C.2009) (dismissing plaintiff's HLPA claim, in part, because plaintiff conceded that the loan was not secured by his principal dwelling). Onyeoziri, therefore, cannot make out a claim for a HLPA violation because HLPA does not cover his transaction with BB & T. As there are no material facts genuinely in dispute, and the record shows appellees are entitled to judgment as a matter of law, the trial court did not err in granting appellees' motion for summary judgment with regard to the statutory claims in Counts I and II of the amended complaint.

## IV. Intentional Interference with Business Relations

We come to a different conclusion with respect to the tort claim and agree with Onyeoziri that the trial court erred in granting summary judgment on Count V, claiming intentional interference with business relations. Appellees argue that the court properly dismissed this claim as well because Onyeoziri did not make a prima facie showing sufficient to overcome summary judgment. We conclude that Onyeoziri has made a prima facie case that appellees intentionally interfered with his business relations—the contract to sell the property to a third-party buyer—and that

there are issues of material fact in dispute concerning the justification for appellees' actions in going forward with the foreclosure sale. Therefore, we reverse summary judgment on Count V and remand the case to the trial court for further proceedings.

 To make out a prima facie case of intentional interference with business relations, the plaintiff must prove: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,* 957 A.2d 890, 900 (D.C.2008) (footnote omitted); *see Paul v. Howard Univ.,* 754 A.2d 297, 309 n. 23 (D.C.2000) ("One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (quoting RESTATEMENT (SECOND) OF TORTS ("RESTATEMENT") § 766 (1979))). To be actionable, the interference need not cause an actual breach of the business relationship, but instead may cause "merely a failure of performance" by one of the parties. *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency,* 834 A.2d 77, 84 (D.C.2003). A defendant, however, may avoid liability if he " 'can establish that his conduct was legally justified or privileged,' " *Murray v. Wells Fargo Home Mortg.,* 953 A.2d 308,

---

tion, Federal Home Loan Corporation, or a bank, trust company, savings and loan association, or savings bank that is regulated and supervised by a supervising federal agency, which entities shall include the fi-

nance and operating subsidiaries of such entities that are so regulated and supervised, the term "covered loan" shall have the same meaning as a mortgage in section 103(aa) of the Truth in Lending Act....

326 (D.C.2008) (quoting *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991)), for example, "in order to protect 'a present, existing economic interest.'" *Id.* (quoting *Raskauskas*, 589 A.2d at 27). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to establish that the interference was "'legally justified or privileged.'" *NCRIC*, 957 A.2d at 901 (quoting *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C.1977)).

The amended complaint alleged that it was appellee's "unreasonable refusal" to permit Onyeoziri to go forward with his contract for the sale of the property, and appellee's insistence on proceeding with the foreclosure sale on June 23, that "interfered with [Onyeoziri's] business relations with the prospective purchaser." As a result, Onyeoziri was unable to realize the contract price ($280,000) negotiated with the buyer, and, instead, BB & T acquired the property for ($59,000) less than a quarter of the negotiated sales price, leaving Onyeoziri with a significant indebtedness to the bank. See note 1, *supra.*

 We review the record to determine whether Onyeoziri presented a prima facie case of intentional interference with his business relations, and begin by pointing to what is undisputed.[15] Appellees knew of Onyeoziri's contract to sell the property after they gave notice of foreclosure, but before the foreclosure sale took place. The evidence of record supports that Spivok sent Onyeoziri notice of the foreclosure proceedings on either May 12, 2009 (as Spivok claims), or May 27, 2009 (as Onyeoziri claims).[16] Thus, it is undisputed that, as the contract to sell the property was executed on June 2, 2009, Spivok and Collins did not have knowledge of the contract when they initiated the foreclosure process. Yet, as the record also demonstrates, it is undisputed that appellees were made aware of the contract by the complaint and motions for injunctive relief filed on June 22, 2009.[17] *See Waldon v. Covington*, 415 A.2d 1070, 1074 n. 11 (D.C.1980) (noting "[t]here is no liability for unintentional interference with contract"). Those pleadings appended a copy of the signed contract for sale for $280,000, a letter prequalifying the buyer for a loan in the amount up to $274,928, and an affidavit from appellant. At a hearing on that same day—the day before the foreclosure sale took place—Onyeoziri testified under oath about the circumstances that led to the contract to sell the property, and presented the supporting documentation. Onyeoziri sought a re-

15. To be clear, the fact that the motions court denied the request to enjoin the foreclosure sale did not insulate appellees from liability for tortious interference. The motions court did not deny the temporary restraining order because appellant's claim had no merit, but because his injury would be monetary and he had a remedy at law. In fact, the motions court commented that if the foreclosure sale improperly interfered with the contract for sale, Onyeoziri would be able to claim he had "been harmed to the extent of whatever the difference is between the two amounts and to the extent that it affects [his] potential liability for the deficit." The motions court's denial of injunctive relief, in other words, was no guarantee that appellees could proceed with the foreclosure sale without any potential liability.

16. At the hearing on the motion for a temporary restraining order, Onyeoziri disputed the effective date of the notice for purposes of contesting whether the thirty-day period required by statute had been provided. *See* D.C.Code § 42–815(c)(4) (2011 Supp.). Under the statute, "[t]he 30–day period shall commence to run on the date of receipt of the notice by the Mayor." *Id.*

17. Whether appellees had been told of Onyeoziri's contract to sell the property at any time prior to the June 22 pleadings is a question for further factual development on remand.

prieve from the foreclosure by filing a motion for temporary restraining order, which appellees vigorously opposed. By proceeding with the foreclosure sale the next day, appellees acted with the knowledge that they were impeding Onyeoziri's ability to perform the contract to sell the property at the $280,000 purchase price, which would have covered his indebtedness to BB & T. See note 1, *supra.* Instead, as a result of the foreclosure sale, Onyeoziri was left with no property and with a substantial unsatisfied amount outstanding on his indebtedness to BB & T. This scenario, including the loss that would be suffered by Onyeoziri if the foreclosure sale preempted the contract for sale, was clearly laid out by appellant's counsel during the hearing on the motion for temporary restraining order. Thus, Onyeoziri presented evidence in support of all four elements of a prima facie case of intentional interference with business relations. *See NCRIC,* 957 A.2d at 900. The burden, therefore, shifted to appellees to produce evidence that their interference was "legally justified or privileged." *Id.* at 901.

■ In their motion for summary judgment, appellees argued that because Spivok and Collins did not have knowledge of Onyeoziri's contract to sell the property when they initiated the foreclosure process by sending a notice to Onyeoziri, their actions, as trustees under the deed of trust, were legally justified. We disagree that merely giving notice of the foreclosure sale pursuant to a valid deed of trust insulated appellees from tort liability and became a safe harbor that entitled them to judgment as a matter of law, without regard to the surrounding circumstances. We conclude that the court erred in granting summary judgment because there are genuine issues of material fact with respect to the reasonableness of continuing with the foreclosure sale, and whether it

was necessary to protect appellees' economic interest, in light of information that came to their attention after the notice of foreclosure, but before the foreclosure sale was consummated.

We have cited the Restatement with approval in defining the defense of legal justification or privilege:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*NCRIC,* 957 A.2d at 901 (quoting RESTATEMENT § 773). This defense, we have said, "is of narrow scope," however, "and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." *Id.* (quoting RESTATEMENT § 773 cmt. a). There can be no question that appellee BB & T had a legally protected interest—the deed of trust—and that the trustees had embarked on a legally sanctioned procedure to recover Onyeoziri's outstanding debt. That appellees had given notice of the foreclosure sale (even if we assume that the notice complied with the statute, see note 16, *supra*) does not insulate appellees from potential liability for intentionally interfering with Onyeoziri's contract to sell the property at an advantageous price. As is evident from the statutory scheme, foreclosure is not a single act but a process that requires the completion of a series of steps by the holder of the note, over a period of time. *See* D.C.Code §§ 42–815 to –817 (2001)

(setting forth the procedures for mortgage foreclosure sales in the District). At the time BB & T foreclosed on Onyeoziri's property, that process included notice of default, notice of foreclosure sale to the owner of the property, notice of foreclosure sale to the Mayor, the passage of thirty days from when the Mayor receives the notice, and, as a final step, the foreclosure sale itself. *See* D.C.Code § 42–815.[18] The foreclosure process may be halted or postponed for any number of reasons, including renegotiation with the creditor bank, cure of the default, or satisfaction of the obligation by, for example, refinancing with another lender. The foreclosure mechanism in the District is not the unitary automatic process appellees suggest. For that reason, appellees are not entitled to judgment as a matter of law simply because they had sent the foreclosure notice to Onyeoziri before they were made aware of his contract to sell the property. Although that fact is relevant, it is equally important to consider all the circumstances after appellees were informed that Onyeoziri had contracted to sell the property for $280,000.

As we explained in *Sorrells*, the Restatement's prohibition on "intentional[ ] *and improper[ ]* interfere[nce] with the performance of a contract" is "simply another way of saying that the alleged tortfeasor's conduct must be legally justified." *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989) (quoting RESTATEMENT § 766). Whether appellees' insistence on continuing with the scheduled foreclosure sale after Onyeoziri made them aware of the contract to sell the property and requested that the sale be called off was improper or privileged is essential to a final determination whether Onyeoziri can prevail on his claim. If appellees' conduct was proper under the circumstances, then proceeding with the foreclosure sale would be justified even if it meant interfering with the contract to sell the property. If, however, appellees' conduct was not justified under the circumstances, then appellees would be liable for interfering with Onyeoziri's business relationship with his buyer. *See* RESTATEMENT § 767 cmts. f, g (noting that the "privilege" to protect one's own economic interests is not absolute). The answers to these questions depend on whether appellees acted in "good faith" and based on their belief that immediate sale was necessary under the circumstances to protect BB & T's security interest because appellees reasonably believed that BB & T's "interest may otherwise be impaired or destroyed by the performance of the con-

---

18. During this process, a residential mortgage debtor has a right to cure the default. *See* D.C.Code §§ 42–815.01(b)–(d). The Council of the District of Columbia recently amended the statutory scheme to provide a borrower with the right to mediation prior to foreclosure on a residential mortgage. *See* D.C. Law 18–314, 57 D.C.Reg. 12,404 (Mar. 12, 2011), D.C.Code § 42–815(b). Now, the note holder cannot exercise the power of sale on a residential mortgage until after he provides a notice of default, a notice of foreclosure, and obtains a mediation certificate. D.C.Code §§ 42–815(b), (c). This amendment added one more step to what is now a four-step process of foreclosure: (1) notice of default, D.C.Code § 42–815(b)(1); (2) notice of inten-

tion to foreclose, *id.* § 42–815(c); (3) foreclosure mediation, including provision of a mediation certificate, *id.* § 42–815.02; and, finally, (4) sale of the property, *id.* §§ 42–816, –817. *See also* D.C. COUNCIL, REPORT ON BILL 18–691, THE "SAVING D.C. HOMES FROM FORECLOSURE AMENDMENT ACT OF 2010," AT 5 (Oct. 26, 2010) ("[A] lender will not be able to foreclose on a residential mortgage loan until the lender has provided the homeowner the opportunity to participate in mediation, and then, only after the lender has obtained a mediation certificate...."). For a mortgage to be considered a "residential mortgage," the debtor or his immediate family must reside in the property. *See* D.C.Code § 42–815.01(a).

tract" to sell the property. RESTATEMENT § 773. This requires an evaluation of the likelihood that the contract for sale presented by Onyeoziri was viable, in the sense that the contract was enforceable and its terms reasonable, that the buyer was able to perform, and that the deal would go to closing in a reasonable time.

On this record, that is not an issue that can be decided as a matter of law. In *Casco Marina Dev.*, we reversed dismissal of a complaint for intentional interference with business relations where a commercial tenant alleged that the landlord improperly refused to consent to a sublease "that fully protect[ed] the landlord's bargain under the prime lease." 834 A.2d at 84. "If it is established that the [landlord] withheld its consent merely to 'leverage' a better bargain for [itself], that would constitute intentional interference with either a contract or business expectancy." *Id.;* see RESTATEMENT § 773 (requiring that, to be justified, interferer's action must be "in good faith"). Here, Onyeoziri presented evidence from which the jury could find that appellees' interests may have been fully protected if the contract for sale went to closing, yet appellees refused that alternative and went forward with a foreclosure sale that redounded to their benefit—BB

& T was the sole bidder at the auction *and* acquired the property for a fraction of the price of the contract for sale—but left Onyeoziri in a much worse position, without the property and with significant remaining indebtedness to the bank. Onyeoziri did not make a bald claim that appellees' refusal to permit the contract to go forward was unreasonable. As required to oppose summary judgment, he presented evidence: a signed and ratified standard-form contract for sale with a proposed closing date of August 30,[19] a letter pre-qualifying the purchaser for a loan geared to the contract price,[20] and an affidavit and testimony attesting to the bona fides of the proposed transaction.[21] Evaluation of that evidence is for the finder of fact. Appellees, for their part, had been forbearing for some time, had begun the process of foreclosure, and could have been skeptical of the likelihood that the contract would go to closing in light of the low ($300) deposit made by the purchaser and doubt that the financing prequalification would ripen into a commitment. See note 20, *supra.* Whether those reservations, even if substantiated, should have freed appellees of any obligation to refrain from taking action that would impede the

19. Appellees assert in their brief, without evidentiary support, that Onyeoziri entered into the contract on the eve of foreclosure, June 22, 2009. The signed contract, however, is dated June 2, 2009, and Onyeoziri testified to that effect. This is an issue of material fact for the jury to decide.

20. The June 8, 2009, prequalification letter from Homestead Funding Corporation refers to a loan to Onyeoziri's buyer to purchase the property. The loan is in the amount of $274,928, leaving a balance of $5,072 for the buyer to complete payment on the $280,000 contract price. The letter provides that it is "intended only to provide preliminary financing pre-qualification, subject to" four stated conditions. At least two of these conditions

appear, from the face of the letter, to have already been satisfied: "1. Ratified contract for purchase, 2. Verification of all funds required to complete transaction (already completed and satisfactory), 3. Verification of income stated in loan application (already completed and satisfactory), 4. Sales contract and pre-HUD–1 on property known as 3108 35th Street, N.E., Washington, DC 20018." The first condition also appears to have been satisfied as the Sales Contract shows a Ratification Date of June 6, 2009.

21. Onyeoziri testified that he entered into the contract on June 2, while he was in Nigeria, before he received the notice of the proposed June 23 foreclosure sale upon returning to the United States, on June 17.

contract also is a material fact in dispute.[22] The factfinder's task is to evaluate the evidence, including the credibility of the witnesses, and to determine "whether [the interference] was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations." *Huff v. Swartz*, 258 Neb. 820, 606 N.W.2d 461, 468 (2000) (internal quotation marks omitted); *see Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853, 858 (1999) ("Only improper interference with a contract is actionable.... Thus, even if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified. The issue in each case is whether the interference is improper or not under the circumstances ...." (internal quotation marks omitted)); *Mitchell v. Aldrich*, 122 Vt. 19, 163 A.2d 833, 837 (1960) ("The law has crystallized relatively few concrete rules to determine the existence or want of privilege. All the circumstances must be analyzed and considered with reference to the type of relation disrupted, the means

employed and the purpose of the actor's interference."). The Restatement lists seven factors to be weighed in determining whether conduct that interferes with business relations is improper: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." RESTATEMENT § 767.

For example, in *Mitchell*, which also involved a debtor's request that a secured creditor permit sale of the collateral to a third party, the Supreme Court of Vermont, after considering the evidence, reversed the grant of judgment, finding "substantial evidence to support the conclusion that the defendants intruded upon [the business] relationship to intercept the prospective gain for themselves." 163 A.2d at 836.[23] The court noted that "[i]t is

---

22. For example, although the contract was contingent on the purchaser obtaining financing, the contingency period had expired on June 16, a week before the foreclosure sale. Moreover, appellees could have agreed to postpone—not cancel—the foreclosure sale, and Onyeoziri might have been able to negotiate an earlier closing date with his purchaser. Appellees cite *Command Consulting Group, LLC v. Neuraliq, Inc.*, 623 F.Supp.2d 49 (D.D.C.2009), for the proposition that a foreclosure sale cannot be halted based on a possibility of selling the property. The court in *Command* "dismiss[ed] an intentional interference claim under D.C. law because the plaintiff 'has not pointed to any specific contractual relations that [the defendant] allegedly interfered with'" *Command*, 623 F.Supp.2d at 52–53 (quoting *Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 496–97 (D.Md.2002) (alteration in original)). Here, Onyeoziri, in testimony and with documentary evidence, pointed to a specific written contract with an

identified purchaser, Osinachi Onyike, who is named as borrower in the Homestead prequalification letter.

23. In *Mitchell*, plaintiffs sought recovery for interference with contract relations, claiming they had been deprived of an agreement to purchase a cattle herd. 163 A.2d at 834. The seller of cattle procured loans from a bank in exchange for collateral which included farm machinery and the herd. *Id.* at 834–35. The seller sought permission to sell the entire herd and entered into a written agreement with the buyer, subject to approval of the bank. *Id.* at 835. The bank sent an appraiser to peg a valuation on the herd and that appraiser then offered the seller a higher purchase price than agreed upon with the original buyer. *Id.* The bank approved of the higher purchase price and the herd was sold to the second buyer. *Id.* The court reasoned that the evidence permitted the jury to conclude that the seller's

only when the actor participated in the exercise of an absolute right, equal or superior to the right invaded, that interference can be justified as a matter of law, and the issue withheld from the jury." *Id.* at 837. The court noted, "[i]n those instances where [the mortgagee] might conclude by fair and honest judgment that the proposed sale would dissipate or jeopardize the security of the loan, a clear right to forbid the sale would exist. But where the integrity of the seller's obligation would not be affected, the mortgagee has no absolute right to prohibit the sale or disrupt the bargain." *Id.* at 838 (citing *Meason v. Ralston Purina Co.,* 56 Ariz. 291, 107 P.2d 224, 228 (1940)).

Similarly in this case, the evidence, taken in the light most favorable to Onyeoziri, supports that by following through with the foreclosure sale after they were made aware of Onyeoziri's contract to sell the property, appellees intentionally interfered with the contract for sale in a manner that, a jury could find, was unnecessary to protect appellees' security interest. If the jury were to come to that conclusion, the sale would have been improper, and appellees would not be entitled to judgment as a matter of law. There is thus a genuine issue of material fact that precludes the grant of summary judgment to appellees. *Molla,* 981 A.2d at 1199–1200. On remand, appellant must prove that the interference was intentional and that he was harmed thereby; appellees have the burden of proving that their actions were justified under the circumstances, consistent with the principles discussed in this opinion. *See NCRIC,* 957 A.2d at 900–01.

\* \* \*

For the foregoing reasons, the Superior Court's judgment is hereby affirmed in part (with respect to the statutory claims), reversed in part (with respect to the tort claim), and the case is remanded for further proceedings.

*So ordered.*

---

promise to the original buyer would have been fulfilled according to its terms had it not been for the second buyer's intervention and approval by the mortgagee of the higher purchase price. *Id.* at 836.