# District of Columbia
# Court of Appeals

Nos. 13-CV-1262, 14-CV-0186 & 14-CV-0187

F I L E D

DEC 24 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

ARTHUR G. NEWMYER, INDIVIDUALLY AND ON BEHALF OF
HIS MINOR DAUGHTER, D.[1],

Appellants/Cross-Appellee,

v.

CAM-3727-11

THE SIDWELL FRIENDS SCHOOL,

Appellee,

and

JAMES F. HUNTINGTON,

Appellee/Cross-Appellant.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  Fisher and Blackburne-Rigsby, Associate Judges, and Ferren, Senior Judge.

## JUDGMENT

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's grant of summary judgment as to appellee/cross-appellant, Dr. Huntington's, counterclaims against appellant/cross-appelle, Mr. Newmyer, for tortious interference with Dr. Huntington's business relationships with appellee Sidwell and Wake Kendall, and for intentional infliction of emotional distress, are reversed.  The matter is remanded for proceedings consistent with this opinion.  In all other aspects, the judgment on appeal is affirmed.

For the Court:

*Tracy B. Dutall*

þOK JULIO A. CASTILLO
Clerk of the Court

Dated: December 24, 2015.

Opinion by Associate Judge Anna Blackburne-Rigsby.

---

[1] The panel has chosen not to use the initials of the minor in this case and refers to her as "D".

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-CV-1262, 14-CV-0186, 14-CV-0187

ARTHUR G. NEWMYER, INDIVIDUALLY AND ON BEHALF OF HIS MINOR DAUGHTER, D.[1], APPELLANTS/CROSS-APPELLEE,

v.

THE SIDWELL FRIENDS SCHOOL, APPELLEE,

AND

JAMES F. HUNTINGTON, APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAM-3727-11)

(Hon. Michael Lee Rankin, Trial Judge)

(Argued January 21, 2015     Decided December 24, 2015)

*Steven S. Rosenthal*, with whom *Kerry Alan Scanlon* and *Jeremy M. White* were on the brief, for appellants Arthur G. Newmyer and D.

*John T. May*, with whom *Raphael J. Cohen* was on the brief, for appellant/cross-appellee Arthur G. Newmyer.

*William D. Nussbaum* for appellee The Sidwell Friends School.

---

[1] We have chosen not to use the initials of the minor in this case and will refer to her as "D."

*Andrew Butz* and *Barton D. Moorstein*, with whom *Barry D. Trebach*, *Katherine B. Yoder*, and *Megan Kinsey-Smith* were on the brief, for appellee/cross-appellant James F. Huntington.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and FERREN, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*: Although many issues are before us, this appeal addresses two primary questions: First, when a school counselor became romantically involved with the mother of a child at the school, did the evidence justify recovery in tort against the counselor and the school, under multiple theories, for endangering the child's well-being? Second, when the child's father not only filed the complaint in court but also publicized it widely through the news media, allegedly as a weapon to disrupt the private life and career prospects of the school counselor, did the evidence justify the counselor's counterclaim in tort for emotional distress and interference with his contractual and business relationships?

Underlying these questions is a troubled marriage, pursuant to which appellant/cross-appellee Arthur G. Newmyer and Tara Mehrbach, the parents of a five-year-old child, appellant D., entered into a separation agreement. While D. was a pre-kindergarten student at the Lower School of The Sidwell Friends School ("Sidwell"), Ms. Mehrbach began dating appellee/cross-appellant Dr. James F. Huntington, a psychologist who served as a school counselor at Sidwell's Middle

School. Mr. Newmyer discovered the relationship and began a determined campaign to have Dr. Huntington fired, which eventually culminated in the present litigation. Dr. Huntington responded to Mr. Newmyer's campaign with litigation of his own. The trial court granted both parties' cross-motions for summary judgment, dismissing the case *in toto*.

Mr. Newmyer appeals from the trial court's dismissal of multiple tort claims, filed individually and on behalf of D., against Sidwell and Dr. Huntington, in which he generally asserts that Dr. Huntington established a physician-patient relationship with D. while engaged in a romantic relationship with D.'s mother Ms. Mehrbach. Mr. Newmyer brought claims for (1) professional malpractice against Sidwell and Dr. Huntington, (2) negligent supervision against Sidwell, (3) breach of fiduciary duty against Sidwell and Dr. Huntington, (4) negligent infliction of emotional distress against Sidwell and Dr. Huntington, and (5) intentional infliction of emotional distress against Sidwell and Dr. Huntington.

Dr. Huntington cross-appeals from the trial court's dismissal of his counterclaims against Mr. Newmyer, in which he generally asserts that Mr. Newmyer maliciously campaigned to have him fired from Sidwell out of spite over the romantic relationship, causing him to lose three jobs and tarnishing his reputation. Dr. Huntington brought claims for (1) tortious interference with

contractual or business relationships with Sidwell and two private practices, The Wake Kendall Group PLLC ("Wake Kendall") and Rathbone and Associates ("Rathbone"); and (2) intentional infliction of emotional distress.

For the reasons that follow, we affirm the trial court's grant of summary judgment dismissing Mr. Newmyer's claims. We reverse the trial court's grant of summary judgment dismissing Dr. Huntington's counterclaims against Mr. Newmyer for tortious interference as to his employment at Sidwell and Wake Kendall, and for intentional infliction of emotional distress. Finally, we affirm the dismissal of Dr. Huntington's counterclaim for tortious interference with his employment at Rathbone.

## I. Factual Background

### A. The Events at Issue

Arthur Newmyer and Tara Mehrbach were married in 2001 and had two daughters while living in Florida. The couple separated in 2009 and entered a separation agreement in which they stipulated that they would live apart, "freed of any and all marital responsibilities and duties[.]" Mr. Newmyer remained in Florida while Ms. Mehrbach relocated with their two daughters to the Washington,

D.C., metropolitan area. Shortly thereafter, Ms. Mehrbach enrolled one daughter, D., then five years old, in the Lower School at Sidwell, over Mr. Newmyer's objections. As a former Sidwell student, Mr. Newmyer thought that the school would not fit D.'s needs, as D. is an advanced learner with a history of emotional problems.

D. in fact experienced adjustment issues related to her emotional problems in her first few months at Sidwell and received report cards that seemed at odds with her intellectual ability. In an effort to help D. succeed at Sidwell, Ms. Mehrbach and Mr. Newmyer engaged Dr. Frederic Solomon, whom Ms. Mehrbach referred to as "a leading pediatric psychiatrist," to treat D. Over the course of this treatment, Dr. Solomon conferred with D.'s teachers at Sidwell and, along with two colleagues, conducted a complete "educational, cognitive, and psychological" evaluation of D. that concluded in March 2010.

Meanwhile, on November 13, 2009, Ms. Mehrbach hosted a potluck dinner at her home for families of pre-kindergarten students enrolled in Sidwell's Lower School. Dr. James Huntington attended the potluck with his daughter, who was D.'s classmate. In addition to being a Sidwell parent, Dr. Huntington is a licensed clinical psychologist who worked as a counselor at Sidwell's Middle School. Dr. Huntington explained in his deposition that Sidwell's Middle School and Lower

School are separated by approximately four miles and that counselors from the Middle School do not generally work with students at the Lower School. Dr. Huntington's statement is corroborated by testimony from Ms. Louise Whalen, the Lower School's resource teacher, and Mr. Stephen Barker, the interim Head of School at Sidwell.[2]

Several months later, on January 12, 2010, Dr. Huntington emailed Ms. Mehrbach to state his regret at being unable to spend more time talking with her at the potluck and to ask whether she would like to arrange a "playdate" for his daughter and D., who seemed to get along well. After scheduling the playdate, the two parents exchanged many emails expressing mutual romantic interest. In one of these emails, Ms. Mehrbach explained that D. had opened Ms. Mehrbach's laptop and had likely seen several emails from Dr. Huntington. Dr. Huntington responded by expressing surprise that D. could read at such a young age, which prompted Ms. Mehrbach to share her frustration at how Sidwell had handled D.'s intellectual needs. Ms. Mehrbach explained that she had intended to mention this topic to him and suggested that they discuss it again in the future.

---

[2] Mr. Barker stated that Dr. Huntington, as "a middle school person . . . would have had nothing to do with [D.] at [the Lower] school."

The playdate occurred on January 22, 2010. Over several hours, Dr. Huntington's three children, including his daughter, interacted with Ms. Mehrbach's two daughters, including D. At some point during the playdate, Dr. Huntington and Ms. Mehrbach discussed D.'s difficulties at Sidwell and Dr. Huntington suggested that Ms. Mehrbach contact the school's resource teacher, Ms. Louise Whalen. Two days later, Ms. Mehrbach summarized her interaction with Dr. Huntington in an email to Mr. Newmyer, explaining that Dr. Huntington had "spent a little time with [D.] on Friday at the playdate and [she] explained [their] frustration with [the] school," and that Dr. Huntington had "agreed to talk to the lower school resource teacher on [D.]'s behalf." In the same email, Ms. Mehrbach explained to Mr. Newmyer that she and Dr. Huntington met for drinks the night after the playdate and again discussed D. so that when Dr. Huntington contacted Ms. Whalen "he could act like he know[s] [D.] better than he does." She also shared that Dr. Huntington "was blown away by her reading, etc." Ms. Mehrbach explained that Dr. Huntington had told her about a "turf war" between Lower School teachers and Ms. Whelan "because the teachers don't want to admit if they cant [sic] handle something." She continued:

> So [Dr. Huntington] is going to call the resource woman
> and explain that he has spent some time with [D.] and
> . . . thinks she needs more stimulation because she is
> really advanced and isn't getting recognized for it. That
> way we don't have to be the pushy . . . parents who went
> around the teachers.

Ms. Mehrbach ended the email by expressing her hope that Dr. Huntington's call to Ms. Whalen, combined with the efforts of D.'s treating psychologist, Dr. Solomon, would help D. to improve at Sidwell. Dr. Huntington testified in his deposition that he does not recall this conversation, though he stated that he and Ms. Mehrbach "would have talked about whatever. And, [he guessed], according to [Ms. Mehrbach's] memories, [they] talked about [D.]."

Dr. Huntington did not follow through on his promise to contact Ms. Whalen about D. until February 22, 2010, a month after the playdate. In a voicemail message, Dr. Huntington told Ms. Whelan that he was calling without "any sense of urgency" regarding Ms. Mehrbach's concern that D. seemed "understimulated." He explained that he had been surprised by D.'s advanced ability and asked Ms. Whalen "if there's just a way to sort of assess this kid or give her some stimulation or something," noting that he thought D. may be "bored" based on his "limited exposure with this child and then talking with the mom[.]"[3]

---

[3] In her deposition, Ms. Whelan testified that she did not understand this voicemail to be "a recommendation or a directive of any sort" and understood that

(continued . . .)

In the months following the playdate, Ms. Mehrbach and Dr. Huntington developed a romantic relationship. They continued to exchange emails about many personal matters, including their children and Ms. Mehrbach's strained relationship with Mr. Newmyer. Mr. Newmyer discovered Ms. Mehrbach's romantic relationship with Dr. Huntington in February 2010. In March 2010, Mr. Newmyer asked a former Sidwell board member, Mr. Daniel Mayers, to contact Sidwell's attorney, Mr. Christopher Davies, regarding Dr. Huntington. Mr. Mayers met with Mr. Davies and conveyed that Mr. Newmyer was very upset about the romantic relationship and encouraged the school to contact Mr. Newmyer to discuss it. Mr. Stephen Barker, then interim Head of School at Sidwell, conducted an internal investigation, during which he discussed the issue with Dr. Huntington. Dr. Huntington denied the existence of a therapeutic relationship with D. and provided a copy of the Newmyers' separation agreement, which indicated that Ms. Mehrbach was free to engage in a romantic relationship. After consulting with Mr. Davies, Mr. Barker determined that the school would not intervene in a personal relationship that existed outside of the school between consenting adults. Mr. Barker explained during his deposition that Dr.

---

(. . . continued)
Dr. Huntington's call resulted from observing D. "in a social setting with family friends."

Huntington's actions did not appear to violate any school policy and that Dr. Huntington "had no direct contact whatsoever with [L]ower . . . [S]chool students in a specific counseling situation."

On April 20, 2010, Mr. Newmyer contacted Mr. Barker directly and claimed that Dr. Huntington was in breach of ethical obligations for serving as D.'s therapist while having a sexual relationship with Ms. Mehrbach. According to Mr. Barker's deposition, Mr. Newmyer told him that if the school did not take action, he was prepared to use his money and connections to "mount a campaign against Sidwell," which "might involve publicity in the Washington Post." On April 22, 2010, Sidwell received a letter from attorney Armin Kuder regarding Dr. Huntington's relationship with Ms. Mehrbach, purporting to write on behalf of an anonymous group of concerned Sidwell community members, including "current and former parents and students and one former board member[.]" Mr. Kuder specifically excluded Mr. Newmyer and D. from this "anonymous group," because he "underst[ood] that they are represented separately." In his deposition, however, Mr. Newmyer stated that Mr. Kuder was in fact retained by and billing Mr. Newmyer for legal services at the time. In this letter, Mr. Kuder asked that Sidwell provide him with its policy on such interactions, any internal communications related to the matter, and the identity of all persons involved in the school's

internal investigation. Should the school fail to provide the requested documents, Mr. Kuder threatened legal action and inquired whether the school would provide legal counsel for Dr. Huntington. Upon receiving this letter, Mr. Barker and Mr. Davies met with Dr. Huntington to discuss the situation and again concluded that Dr. Huntington's relationship with Ms. Mehrbach did not raise a concern.

In June 2010, Mr. Newmyer filed for divorce from Ms. Mehrbach in Florida. As part of the divorce proceedings, Mr. Newmyer subpoenaed from Sidwell all emails from Dr. Huntington's school account that involved Ms. Mehrbach, many of which were sexually explicit. After reviewing these emails, an attorney for Mr. Newmyer informed Sidwell that he would prepare some of these subpoenaed materials for the school's review.[4] On February 1, 2011, Mr. Newmyer's attorney produced a memorandum for Sidwell analyzing Dr. Huntington's conduct and appended many of the subpoenaed emails. Separately, Mr. Newmyer provided this memorandum with the appended emails to several members of Sidwell's Board of Trustees on February 11, 2011. Mr. Thomas Farquhar, Sidwell's new Head of School, read the memorandum and appended emails and terminated Dr. Huntington on February 16, 2011. As grounds for termination, Mr. Farquhar

---

[4] Sidwell had apparently responded to Mr. Newmyer's discovery request by providing emails within a requested date range and did not internally review the emails before satisfying the request.

explained that he had relied primarily on the emails, rather than the memorandum, to conclude that Dr. Huntington had violated school policy. Specifically, Mr. Farquhar determined that Dr. Huntington had used a Sidwell email account to send "a super abundance of personal communications relative to professional communications[,]" had been "indiscreet" with confidential information, and had sent many messages that ignored the school's caution that "employees should not presume that their communication would be private."

## B. The Present Litigation

On May 12, 2011, Mr. Newmyer filed a civil complaint in the Superior Court in which he alleged, *inter alia*, that a physician-patient relationship between Dr. Huntington and D. formed during the January 22, 2010, playdate and that Dr. Huntington's call to Ms. Whelan was a professional referral arising out of his observations in his capacity as a psychologist. Citing the ensuing romance between Ms. Mehrbach and Dr. Huntington, Mr. Newmyer brought claims for (1) professional malpractice against Sidwell and Dr. Huntington, (2) negligent supervision against Sidwell, (3) breach of fiduciary duty against Sidwell and Dr. Huntington, (4) negligent infliction of emotional distress against Sidwell and Dr. Huntington, and (5) intentional infliction of emotional distress against Sidwell and Dr. Huntington. The complaint referenced many emails

between Dr. Huntington and Ms. Mehrbach and laid out in detail the specific sexual acts that the two had discussed throughout the emails, citing for "illustrat[ion]" to a particularly sexually explicit portion of an email from Dr. Huntington in which he described a sex act involving Ms. Mehrbach.

On the day he filed his complaint, Mr. Newmyer hired a communications firm to distribute the complaint to multiple newspapers, including the Washington Post and the New York Times, and to multiple local and national television stations.[5] On May 17, 2011, counsel for Mr. Newmyer submitted the complaint to the District of Columbia Board of Psychology, suggesting that Dr. Huntington had "breached multiple sections of the APA Ethical Principles and Code of Conduct," promising to provide supporting documents after discovery, and expressing interest in participating in meetings regarding the Board's investigation. The Board initiated an investigation shortly thereafter. On May 18, 2011, the Maryland Board of Examiners of Psychologists initiated a similar inquiry, apparently in response to

---

[5] In an answer to Sidwell's interrogatories, Mr. Newmyer acknowledged that he distributed the complaint to multiple news outlets. This court initially sealed Mr. Newmyer's answer to this interrogatory in response to his unopposed motion to redact portions of the appendix on appeal, pursuant to a consent order issued by the trial court. However, the trial court's consent order extends only to personal information pertaining to minor children, and thus does not include Mr. Newmyer's answer to this interrogatory.

a newspaper article.[6] Both Boards subsequently cleared Dr. Huntington of wrongdoing in 2012. Notably, the District of Columbia Board of Psychology concluded "after a thorough investigation" that "there was no evidence to indicate that Dr. Huntington provided psychological services to Tara and Arthur Newmyer's daughter, [D.,]" and that, accordingly, Dr. Huntington's relationship with Ms. Mehrbach "did not violate any provision of the Health Occupations Revision Act or the APA Code of Ethics."

News of Mr. Newmyer's allegations eventually reached two private psychological treatment practices, Wake Kendall and Rathbone, where Dr. Huntington provided services to patients as an independent contractor.[7] Wake Kendall received notice of forthcoming litigation and Board proceedings against Dr. Huntington from one of Mr. Newmyer's attorneys in a letter dated September

---

[6] The Maryland Board's letter of notice to Dr. Huntington appears to contain a typographical error. In the first paragraph, the letter states that the Board's investigation commenced on "4/18/2011" but directs Dr. Huntington to an attached "Board Initiated Inquiry Form" that provides "5/18/11" as the date the Board received the inquiry. The Board Initiated Inquiry Form then cites to an "attached newspaper article" that, presumably, was an article discussing the civil complaint filed May 12, 2011.

[7] Wake Kendall referred to Dr. Huntington as an "associate" and stated that there were no conditions preventing Wake Kendall or Dr. Huntington from terminating the relationship. Dr. Huntington referred to himself as an "independent contractor" at Wake Kendall. Rathbone referred to Dr. Huntington as an "independent contractor."

17, 2010. In that letter, Mr. Newmyer explained through his attorney that D. had been evaluated by Wake Kendall at some point in the past and that D.'s sister had recently been evaluated. Mr. Newmyer demanded that all future contact with his two daughters cease in light of Dr. Huntington's position at Wake Kendall. When Wake Kendall subsequently learned of the District of Columbia Board of Psychology inquiry, it decided to place Dr. Huntington on leave pending the outcome of the inquiry. Wake Kendall was aware of Mr. Newmyer's civil complaint, but did not cite the complaint as the basis for its decision. Dr. Huntington did not seek reinstatement at Wake Kendall after the Board cleared him of wrongdoing. Rathbone learned of Mr. Newmyer's civil complaint from a newspaper article and terminated its relationship with Dr. Huntington the following day, May 13, 2011. Rathbone stated that it was "concerned about the impact of the allegations" in the complaint that Dr. Huntington "had broken confidentiality" and about "the sexually explicit content of the e-mails[.]"

Dr. Huntington filed a counter-complaint against Mr. Newmyer on December 30, 2011, alleging (1) tortious interference with his contractual or business relationships with Sidwell, Wake Kendall, and Rathbone; and (2) intentional infliction of emotional distress. Dr. Huntington also brought claims for defamation and false light invasion of privacy, but the trial court dismissed those

claims as time-barred and Dr. Huntington has not appealed this dismissal. The parties filed motions for summary judgment as to all remaining claims and the trial court granted the motions in full. This appeal and cross-appeal followed.

## II. Discussion

We review the trial court's grant of a motion for summary judgment *de novo*. *Steele v. Salb*, 93 A.3d 1277, 1281 (D.C. 2014). We will affirm where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Franco v. District of Columbia*, 39 A.3d 890, 894 (D.C. 2012) (quoting Super. Ct. Civ. R. 56 (c)). "Once the movant has made a sufficient evidentiary showing to support the motion, the opposing party's response 'must set forth specific facts showing that there is a genuine issue for trial.'" *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1037 (D.C. 2014) (quoting Super. Ct. Civ. R. 56 (e)). Our review takes all inferences in favor of the opposing party, but mere "conclusory allegations" are insufficient to defeat the motion. *Steele, supra*, 93 A.3d at 1281. Summary judgment is warranted where the opposing party fails to "establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Night & Day Mgmt., LLC, supra*, 101 A.3d at 1037 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## A. Mr. Newmyer's Claims on Appeal

### i. Negligence Claims

The prima facie elements for a professional malpractice claim and a negligent infliction of emotional distress claim are essentially the same. To carry his burden under both claims, Mr. Newmyer must establish that (1) Dr. Huntington owed a legal duty to conform to a standard of care with regard to D., (2) he deviated from that standard of care, and (3) there is a causal relationship between this deviation and an injury. *See Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997) (listing the three elements for professional malpractice); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011) (en banc) (listing three similar elements for negligent infliction of emotional distress). Whether the facts in the record give rise to a legal duty — when viewed in the light most favorable to Mr. Newmyer on *de novo* review — is "an issue of law to be determined by the court as a necessary precondition to the viability of a cause of action for negligence." *Hedgepeth v. Whitman Walker Clinic, supra*, 22 A.3d at 810–11 (stating that in order to recover for negligent infliction of

emotional distress, a plaintiff must first show that "the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff of a nature that necessarily implicates the plaintiff's emotional well-being"); *see also In re Sealed Case*, 67 F.3d 965, 968 (D.C. Cir. 1995) (stating that in order to recover for medical malpractice, a plaintiff must first show a duty, which may be predicated upon a physician-patient relationship).

While facts demonstrating a physician-patient relationship may give rise to a duty of care, this court has refrained from deciding whether such a relationship is a necessary element of a malpractice claim. *See Gilbert v. Miodovnik*, 990 A.2d 983, 991 & n.9 (D.C. 2010). Here, Mr. Newmyer asserts that Dr. Huntington's actions established a physician-patient relationship that gives rise to a duty and, in the alternative, that a general duty of care exists due to Dr. Huntington's status as a school counselor who is a licensed psychologist. Although the present case involves an alleged psychologist-patient relationship, we will view this relationship in the same light as a physician-patient relationship for the purposes of a malpractice claim. *McCracken v. Walls-Faufman*, 717 A.2d 346, 351 (D.C. 1998) (discussing the existence of a duty for both physicians and psychologists under a medical malpractice claim). The record, however, does not support either of Mr. Newmyer's assertions.

"The relation of physician and patient is a consensual one depending on the physician's acceptance of the patient and the latter's assent to the medical services." *Hankerson v. Thomas*, 148 A.2d 583, 584 (D.C. 1959) (per curium). A physician-patient relationship may arise by express or implied contract, "and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *Dehn v. Edgecombe*, 865 A.2d 603, 611 (Md. 2005). Yet, because consent is the operative factor, "when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established." *Id.* For example, a physician-patient relationship may be established by examining the patient, independently reviewing or analyzing a patient's medical records, engaging in a continuous course of treatment, rendering a medical opinion, or controlling a patient's course of treatment. *Gilbert, supra*, 990 A.2d at 991.

There is no evidence that Dr. Huntington or Ms. Mehrbach ever expressly created a consensual physician-patient relationship between Dr. Huntington and D. Both Dr. Huntington and Ms. Mehrbach testified that they neither formed nor intended to form a physician-patient relationship with regard to D. In an email dated February 14, 2010, Dr. Huntington stated his understanding that he was not acting pursuant to a physician-patient relationship when he assured Ms. Mehrbach

that his relationship with her — the mother of a Sidwell student — did not violate Sidwell's rules or any ethical rule, as would "dating patients or moms/dads of patients."[8] Furthermore, the record details the extensive efforts of Ms. Mehrbach and Mr. Newmyer to help D. assimilate at Sidwell, most notably by "engag[ing]" at least three professionals to provide psychological services, in collaboration with D.'s teachers. Mr. Newmyer and Ms. Mehrbach were well-acquainted with the process for initiating such professional relationships, and Ms. Mehrbach would undoubtedly have formally approached Dr. Huntington if she sought to expressly initiate a physician-patient relationship on D.'s behalf. Accordingly, there is no genuine issue, with evidence sufficient to support a jury finding, that an express physician-patient relationship existed between Dr. Huntington and D.

Yet Mr. Newmyer also asserts that a physician-patient relationship existed by implication, based on three primary facts: (1) Dr. Huntington "observed and evaluated" D. during the January 22, 2010 playdate and on other occasions, including one occasion when he took D. and his daughter to a park; (2) Dr.

---

[8] To the extent that Mr. Newmyer draws attention to a possible physician-patient relationship between Dr. Huntington and Ms. Mehrbach, the record is equally clear that no such relationship existed. In multiple emails in January 2010, Dr. Huntington explicitly told Ms. Mehrbach "I am not your therapist" when discussing a personal issue during a flirtatious exchange, and he also explained that he would "listen and talk" with her as she sorts through her divorce, but that his "strong feelings" for her would "color" his responses.

Huntington called Ms. Whalen and "made a specific 'recommendation' that D. receive more academic stimulation"; and (3) Dr. Huntington provided "professional advice and counseling services to D. through her mother," including suggesting "play therapy," over the course of multiple email conversations in which Ms. Mehrbach provided detailed information and documentation about D.'s "mental health and cognitive behavior."

In the absence of an express physician-patient relationship, a physician must "take some action to treat the person before the physician-patient relationship can be established." *Dehn, supra*, 865 A.2d at 611. The record does not support Mr. Newmyer's assertions that Dr. Huntington took steps to treat D. pursuant to an implied physician-patient relationship. Rather, the record demonstrates that Dr. Huntington interacted with D. informally during the course of his romantic relationship with her mother, Ms. Mehrbach. Regarding the first and third above listed facts, Dr. Huntington and Ms. Mehrbach shared information about their family lives and personal concerns in emails and in-person interactions. Viewing the evidence in Mr. Newmyer's favor, as we must on appeal, there is no evidence in the parties' depositions or email exchanges to suggest that the January 22, 2010 playdate at Ms. Mehrbach's home was anything other than an opportunity to pursue a mutual romantic interest while their daughters interacted outside of

school. During this playdate at Ms. Mehrbach's home, Dr. Huntington was within close proximity to D. and made casual observations to Ms. Mehrbach about D.'s reading and writing abilities with reference to his own daughter's abilities. Indeed, this topic had come up before in an email exchange between Ms. Mehrbach and Dr. Huntington after D. inadvertently stumbled upon several of their romantic email exchanges. That these observations were uttered by Dr. Huntington, a licensed psychologist, during the playdate and over exchanged emails does not turn them into "professional conclusions" rendered to treat D. pursuant to a physician-patient relationship, as Mr. Newmyer casts them. *See Dehn, supra*, 865 A.2d at 611.

Nor is there any support for Mr. Newmyer's assertion that Dr. Huntington's offer to call Ms. Whalen, Sidwell's resource teacher, and his accompanying voicemail to Ms. Whalen, were something other than friendly gestures. Ms. Mehrbach claimed she learned of a "turf war" between the resource teacher and D.'s teachers and told Mr. Newmyer in an email that Dr. Huntington's offer to call Ms. Whalen would help prevent an uncomfortable situation. When Dr. Huntington called Ms. Whalen, he relied on his own daughter's interactions with D. as classmates and Ms. Mehrbach's statements about D. rather than making a professional conclusion, stating that

the mom has indicated that [D.] seems under stimulated . . . the mom is very open about saying, you know, 'I'm sure my daughter isn't the most pleasant person to be around or can be sort of moody . . . ' [and] mentioned to me something about a recent report card not having, um, not recognizing, sort of, her daughter's, uh, at least academic potential or learning potential.

He finished the call by asking Ms. Whalen "if there's just a way to sort of assess this kid or give her some stimulation or something" and stressed that he was "just basing it on [his] limited exposure with this child and then talking to the mom[.]" This voicemail indicates that Ms. Whalen, not Dr. Huntington, would have the ultimate authority to make the decision as to D.'s needs while at Sidwell. *See Gilbert, supra,* 990 A.2d at 991–93 (explaining that the absence of decision-making authority over a patient's course of treatment suggests no physician-patient relationship).[9] Accordingly, no implied physician-patient relationship giving rise to a legal duty existed between Dr. Huntington and D.

---

[9] While not dispositive on the issue, Ms. Whalen testified in her deposition that she understood Dr. Huntington's call to be the result of "having seen D. . . . in a social setting with family friends." Further, Ms. Mehrbach offhandedly explained during her deposition that she often asks another friend who is a therapist for advice about D.

In the alternative, Mr. Newmyer asserts that Dr. Huntington owed a general duty to D. "as a licensed psychologist and school counselor who undertook to help D. while she was a student at Sidwell" because he "conduct[ed] an evaluation . . . , provid[ed] continued advice and counseling support," and provided a "recommendation" to the school's resource teacher. We disagree for the same reasons that Dr. Huntington's actions did not create a physician-patient relationship: the facts in the record, even when viewed in favor of Mr. Newmyer, simply do not support this claim. While Dr. Huntington's actions on behalf of D. were no doubt motivated by a genuine desire to help her succeed at Sidwell, he did not trigger the duty that accompanies his role as a school counselor by simply expressing interest in D.'s well-being in emails to Ms. Mehrbach, with whom he was romantically involved. Nor did he trigger this duty by offering to make a phone call to alleviate Ms. Mehrbach's concern that she might be perceived as "pushy" by D.'s teachers. Furthermore, Dr. Huntington served as a counselor at Sidwell's Middle School, not Sidwell's Lower School where D. was a student. As stated by Mr. Barker, Sidwell's interim Head of School, "a middle school person . . . would have had nothing to do with [D.] at [the Lower] school." Ms. Whalen later echoed this fact. Mr. Newmyer's speculation that Dr. Huntington may interact with Lower School students does not overcome this evidence.

In sum, we perceive no genuine issue of material fact here; on this record, no reasonable jury could find that Dr. Huntington owed a legal duty to D. pursuant to a physician-patient relationship or his position as a school counselor. We are unpersuaded by Mr. Newmyer's argument that a duty of care exists based upon facts demonstrating Dr. Huntington's romantically-motivated actions. Such a broad interpretation of professional duty would risk putting doctors, lawyers, and other professionals at risk of incurring civil liability for innocuous day-to-day interactions.[10] Thus, we affirm the trial court's granting of summary judgment dismissing both of Mr. Newmyer's negligence claims.

---

[10] As an alternative to his negligence claims, Mr. Newmyer cites *Church of Scientology Int'l v. Eli Lilly & Co.* to argue that Dr. Huntington entered a fiduciary relationship with Ms. Mehrbach after she placed her "trust or confidence" in him regarding information about her marriage, D.'s emotional issues at Sidwell, and D.'s relationship with her father. 848 F. Supp. 1018, 1028 (D.D.C. 1994) (citation omitted) ("[T]he relationship exists in all cases in which influence has been acquired and betrayed . . . [including] informal relations which exist whenever one man trusts in, and relies upon, another . . . ."). Mr. Newmyer suggests that Ms. Mehrbach "would not have asked for [Dr. Huntington's] advice and opinions if he had not been a psychologist and did not have a position of influence at the school by reason of being a psychologist and/or counselor."

Mr. Newmyer did not raise a breach of fiduciary duty claim as to Ms. Mehrbach before the trial court. Instead, he argued that Dr. Huntington entered a fiduciary duty with D. by way of his status as a "psychologist, psychotherapist and/or counselor who provided counseling instruction and guidance to Sidwell students and their families" and that he breached this duty by engaging "in a sexual relationship with D.'s married mother while still acting as her school

(continued . . .)

### ii. Intentional Infliction of Emotional Distress

To survive a motion for summary judgment, Mr. Newmyer must establish a prima facie case of intentional infliction of emotional distress by showing (1) extreme and outrageous conduct on the part of Dr. Huntington or Sidwell that (2) intentionally or recklessly (3) caused Mr. Newmyer or D. severe emotional distress. *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010); *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). To be actionable, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tulin, supra*, 994 A.2d at 800 (citation omitted). "This

---

(. . . continued)
psychologist[.]" We need not address this claim for the first time on appeal. *See District of Columbia v. Patterson*, 667 A.2d 1338, 1347–48 (D.C. 1995). Yet, even if Mr. Newmyer had raised this claim below, it fails for the same reason that his negligence claims fails: the absence of any duty or, more specifically, the absence of "a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." *See Church of Scientology Int'l, supra* note 10, 848 F. Supp. at 1028 (quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (Am. Law. Inst. 1979)).

requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id.* at 1316 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. H (AM. LAW. INST. 1965)). Where reasonable persons may differ, the question must go to the jury "to determine whether, in the particular case, the conduct has been sufficient[ly] extreme and outrageous to result in liability." *Id.*

Mr. Newmyer asserts that Dr. Huntington "abused his position as a school counselor" by intentionally or recklessly engaging in a sexual relationship with Ms. Mehrbach "in the course of counseling D." while knowing "the foreseeable harm and confusion it would have on D." Mr. Newmyer further asserts that Sidwell was warned of Dr. Huntington's conduct and did nothing to stop it for nearly a year. The result, according to Mr. Newmyer, was that he and D. suffered severe emotional distress. We disagree.

As we have already concluded, the record does not demonstrate that Dr. Huntington ever served in a professional capacity as a school counselor to D., much less that he intentionally or recklessly engaged in a sexual relationship with

Ms. Mehrbach "in the course of counseling D."[11] The record evidence, as thoroughly recited in this opinion, simply does not reflect "extreme or outrageous" conduct on Dr. Huntington's part to support a claim for intentional infliction of emotional distress and survive summary judgment. *See Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965) (stating that an intentional infliction of emotional distress claim may lie where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'")). Accordingly, we affirm the trial court's entry of summary judgment in favor of Dr. Huntington and Sidwell.[12]

### iii. Negligent Supervision

To carry his burden for a negligent supervision claim and survive summary judgment, Mr. Newmyer must show a genuine issue of material fact as to whether Sidwell (1) "knew or should have known" that Dr. Huntington "behaved in a dangerous or otherwise incompetent manner"; and (2) "armed with that actual or

---

[11] See *supra* section A-i.

[12] To the extent that Mr. Newmyer argues that Dr. Huntington's acts toward D. caused him severe emotional distress, any harm he experienced would be derivative of harm to D., which the record does not support.

constructive knowledge, failed to adequately supervise" Dr. Huntington. *Tulin, supra,* 994 A.2d at 794 (citation omitted). Mr. Newmyer has failed to carry this burden.

Mr. Newmyer argues that Sidwell breached its duties to supervise Dr. Huntington and "keep students placed within [Sidwell's] care safe from harm or danger" when it failed to prevent harm to D. and Mr. Newmyer from Dr. Huntington's romantic relationship with Ms. Mehrbach.

Because Mr. Newmyer must show that Dr. Huntington acted in a dangerous or incompetent manner, his negligent supervision claim against Sidwell fails with his claims against Dr. Huntington.[13] Even if Mr. Newmyer's claims against Dr. Huntington did not fail, however, Sidwell's response to the situation was anything but negligent. When the administration first learned in March 2010 that Dr. Huntington and Ms. Mehrbach were romantically involved, it immediately conducted an internal investigation and determined that it would not intervene in a personal relationship that did not involve D., did not violate its policies, and existed outside of the school between consenting adults. When the administration subsequently learned in February 2011 that Dr. Huntington had misused his

---

[13] See *supra* sections A-i and A-ii.

Sidwell email account in conversations with Ms. Mehrbach, it again acted quickly to review the emails before terminating Dr. Huntington for violating its policies. Sidwell had no notice of these policy violations in March 2010, and even if it had somehow opted to review Dr. Huntington's email account without cause on its own initiative, it could not have discovered evidence that Dr. Huntington's actions harmed D. because no such evidence exists. Accordingly, Mr. Newmyer has failed to show that Sidwell negligently supervised Dr. Huntington, and we affirm the trial court's grant of summary judgment regarding this claim in favor of Sidwell.

## B. Dr. Huntington's Counterclaims

### i. *Tortious Interference with Business or Contractual Relationships*

Our law of tortious interference with business or contractual relationships derives from the Restatement (Second) of Torts. *See Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989) (applying RESTATEMENT (SECOND) OF TORTS §§ 766–67 (AM. LAW. INST. 1979)). To establish a prima facie case of tortious interference and survive summary judgment, Dr. Huntington must demonstrate: "(1) existence of a valid contractual or other business relationship; (2) [Mr. Newmyer's] knowledge of the relationship; (3) intentional interference with that relationship by [Mr. Newmyer]; and (4)

resulting damages.'" *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015) (quoting *Onyeoziri v. Spivok*, 44 A.3d 279, 286–87 (D.C. 2012).

Dr. Huntington bears the burden to establish a "substantial and direct causal link" between Mr. Newmyer's alleged interference and the damages suffered. *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47, 51 (D.C. 1991) (quoting *Dalo v. Kivitz*, 596 A.2d 35, 41 (D.C. 1991)). Interference is actionable where it "induc[es] or otherwise caus[es] the third person [here, Sidwell] not to perform" and it "need not cause an actual breach of the business relationship, but instead may cause 'merely a failure of performance' by one of the parties." *Onyeoziri, supra*, 44 A.3d at 286 (citations omitted). The Restatement provides seven factors to aid a fact-finder in determining whether recovery is available:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Onyeoziri, supra,* 44 A.3d at 291 (quoting RESTATEMENT (SECOND) OF TORTS § 767). The "key consideration," however, is the actor's "motive" for interfering. *Havilah, supra,* 108 A.3d at 346. Dr. Huntington raised tortious interference claims with regard to his employment at Sidwell and his business relations with two private practices, Wake Kendall and Rathbone. For the reasons that follow, we conclude that he has made a prima facie case with regard to Sidwell and Wake Kendall.

Looking first to Sidwell, Dr. Huntington argues that he was fired from Sidwell only after Mr. Newmyer (1) submitted an attorney-prepared memorandum to Sidwell's administration and Board of Trustees that analyzed Dr. Huntington's purported tortious conduct and appended many of the emails subpoenaed by Mr. Newmyer in the course of divorce proceedings and (2) threatened litigation and public exposure if Sidwell did not fire Dr. Huntington. Dr. Huntington cites *Onyeoziri* and the Restatement factors to argue that even if Sidwell had valid reasons for firing him, those reasons do not absolve Mr. Newmyer of his causal conduct. *See Onyeoziri, supra,* 44 A.3d at 291 (citation omitted) ("All the circumstances must be analyzed and considered with reference to the type of relation disrupted, the means employed and the purpose of the actor's interference.").

The parties do not dispute that Dr. Huntington was an at-will employee at Sidwell. Mr. Newmyer suggests that Dr. Huntington's at-will status precludes his claim of tortious interference. We disagree. We have previously held that liability for tortious interference may lie where an actor interferes with an at-will employee's relationship with an employer. *See Sorrells, supra,* 565 A.2d at 288, 291, 292 (concluding that an at-will employee at a department store could bring a claim for tortious interference with a contract against an agent of her employer). Moreover, the District of Columbia derives the elements of tortious interference with a contract and/or prospective advantage from the Restatement. *See Havilah, supra,* 108 A.3d 349 (clarifying that "our jurisdiction embraces the Restatement's definition of tortious interference and its defenses"); *see also Onyeoziri, supra,* 44 A.3d at 286 (quoting the RESTATEMENT (SECOND) OF TORTS § 766 (AM. LAW. INST. 1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.")). In comment g to this section, the Restatement explains that a contract that is terminable at-will is "valid and subsisting" until terminated "and the defendant may not improperly interfere with it." Applying the Restatement, we conclude that an at-will employment relationship of the kind that

existed between Dr. Huntington and Sidwell is a valid and subsisting business relationship for the purposes of a tortious interference claim.[14]

Mr. Newmyer cannot dispute that he knew of this business relationship, given his determined efforts to suggest a conflict between Dr. Huntington's employment at Sidwell and his romance with Ms. Mehrbach. Nor can Mr. Newmyer dispute his well-documented and deliberate efforts to encourage Sidwell to take action against Dr. Huntington. Accordingly, the only element of tortious interference that remains in dispute is the causal relationship between Mr. Newmyer's actions and the resulting damage, namely, the termination of Dr. Huntington's employment at Sidwell.

---

[14] Dr. Huntington's counterclaim against Mr. Newmyer for interfering with Dr. Huntington's relationship with Sidwell falls outside the line of cases in which we have held that an at-will employee, barred from challenging termination of employment, is also barred from bringing a tortious interference claim — essentially attacking the same termination — against third parties affiliated with that employer. *See Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 807 (D.C. 2003) (stating that an at-will employee cannot bring a wrongful discharge claim against an employer nor a tortious interference claim for the same termination); *McManus v. MCI Commc'n Corp.*, 748 A.2d 949, 958 (D.C. 2000) ("it is axiomatic that an employer cannot interfere with its own contract"); *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 433 (D.C. 1996) (finding no basis for an at-will employee to bring a tortious interference claim against an employer for wrongful discharge); *Cf. Metz v. BAE Sys. Tech. Solutions & Servs. Inc.*, 774 F.3d 18, 21, 23 (D.C. Cir. 2014) (concluding that there is no tortious interference claim for at-will employees in the District of Columbia).

Viewing the evidence in the light most favorable to Dr. Huntington, we cannot conclude, as a matter of law, that Mr. Farquhar, Sidwell's Head of School, relied solely on the emails attached to the attorney-prepared memorandum in deciding to fire Dr. Huntington. Reaching this conclusion, as Mr. Newmyer would have us do, would usurp the role of the fact-finder. Mr. Farquhar testified in his deposition that the memorandum contained "sufficient information . . . to serve as grounds for termination" but stated that his decision was "based more on the emails attached to the memorandum." We agree that a jury may credit Mr. Farquhar's testimony at trial as evidence that he was not influenced by Mr. Newmyer's threat of litigation; however, it need not do so given Mr. Farquhar's exposure to the memorandum summarizing Dr. Huntington's alleged tortious conduct that accompanied those emails.

To be sure, Dr. Huntington's violation of Sidwell policies provided valid independent reasons to fire Dr. Huntington in the absence of any intentional interference by Mr. Newmyer. Yet, the fact that Sidwell had an independent reason for firing Dr. Huntington is in no way dispositive to the question of liability for tortious interference. *See Onyeoziri, supra,* 44 A.3d at 291 (stating that "[the fact-finder's] task is to evaluate the evidence . . . to determine whether the interference was improper under the circumstances" and considering the factors

listed in the RESTATEMENT (SECOND) OF TORTS § 767) (quotations and alterations omitted). The evidence in the record demonstrates a genuine issue of material fact and does not establish, as Mr. Newmyer suggests, that Mr. Farquhar relied solely upon "the transmission of truthful information[, which] cannot serve as the basis for a tortious interference claim." We reverse the trial court's entry of summary judgment in favor of Mr. Newmyer as to Dr. Huntington's counterclaim for tortious interference with his employment at Sidwell.

We reach a similar conclusion with regard to Dr. Huntington's business relationship with Wake Kendall, which the record indicates was an independent contractor relationship. Mr. Newmyer was aware of this business relationship and intentionally interfered with it, as demonstrated by his attorney's September 17, 2010, letter informing Wake Kendall of forthcoming litigation and Board inquiries against Dr. Huntington. As with Dr. Huntington's employment at Sidwell, the only element of tortious interference that remains in dispute as to Wake Kendall is the causal relationship between Mr. Newmyer's interfering actions and the resulting damage, namely, Wake Kendall's decision to place Dr. Huntington on leave pending an inquiry by the District of Columbia Board of Psychology.

Dr. Huntington alleges that Mr. Newmyer's interfering actions included sending the September 17, 2010, letter, publicizing his subsequently-filed civil

complaint to multiple media outlets on May 12, 2010, and initiating an inquiry at the District of Columbia Board of Psychology five days later. Wake Kendall testified in a deposition that its decision to place Dr. Huntington on leave was based on the Board's inquiry but that it was also aware of the civil complaint. On these facts, there exists a genuine issue of material fact for a jury as to whether Mr. Newmyer's actions caused Dr. Huntington to be placed on leave. Accordingly, we reverse the trial court's entry of summary judgment in favor of Mr. Newmyer as to Dr. Huntington's counterclaim for tortious interference with his position at Wake Kendall.

As to Dr. Huntington's business relationship with Rathbone, the record indicates that Dr. Huntington was an independent contractor. The record does not establish, however, that Mr. Newmyer knew of Dr. Huntington's business relationship with Rathbone such that Mr. Newmyer could intend to interfere with it. Accordingly, we affirm the trial court's entry of summary judgment in favor of Mr. Newmyer as to Dr. Huntington's counterclaim for tortious interference with his position at Rathbone. *See Alston v. United States*, 518 A.2d 439, 440 n.2 (D.C. 1986) ("It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court.").

### *ii.   Intentional Infliction of Emotional Distress*

To survive summary judgment, Dr. Huntington was required to meet the standard for intentional infliction of emotional distress that we articulated *supra* in section A-ii:  he must show (1) extreme and outrageous conduct on the part of Mr. Newmyer that (2) intentionally or recklessly (3) caused him severe emotional distress. *See Tulin, supra*, 994 A.2d at 800.  To be actionable, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).  "The requirement of outrageousness is not an easy one to meet." *Drejza, supra*, 650 A.2d at 1312.  "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Id.* at 1316 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. h).  Where reasonable persons may differ, the question must go to the jury "to determine whether, in the particular case, the conduct has been sufficient[ly] extreme and outrageous to result in liability." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h).

Dr. Huntington primarily contends that Mr. Newmyer's use of a communications firm to publicize the civil complaint immediately after he filed it was an "extreme and outrageous" act. Dr. Huntington argues that publicizing such a complaint, which contained direct quotes from sexually explicit emails between Dr. Huntington and Ms. Mehrbach, went "beyond all possible bounds of decency." *Tulin, supra*, 994 A.2d at 800 (citation omitted). Moreover, Dr. Huntington alleges that publicizing the complaint was merely the culmination of a string of such conduct — which included subpoenaing Dr. Huntington in the Newmyer divorce proceedings — all aimed at "furthering [Mr. Newmyer's] malicious desire to inflict financial, professional, and emotional pain[.]" This conduct caused severe emotional distress, Dr. Huntington argues, as demonstrated by a multitude of symptoms, including "low affect, loss of appetite, low energy, sleep disturbances and periods of weepiness." Dr. Huntington supported these symptoms with deposition testimony from Dr. Mitch Earlywine, Ph.D, who is Dr. Huntington's mentor and professor, and from whom Dr. Huntington sought behavioral and cognitive assistance.

The District of Columbia recognizes an absolute privilege for "statements published incidental to judicial proceedings . . . , providing the statements are relevant to the proceeding." *Mazanderan v. McGranery*, 490 A.2d 180, 181 (D.C.

1984). *See also* RESTATEMENT (SECOND) OF TORTS § 587 (1977); *Mohler v. Houston*, 356 A.2d 646, 647 (D.C. 1976) (explaining, in the context of the analogous privilege for attorneys, RESTATEMENT (SECOND) OF TORTS § 586 (1938), that "[t]he question of relevance is a question of law for the court to determine").[15] Mr. Newmyer contends that his actions fall within this privilege. While we agree that the contents of Mr. Newmyer's civil complaint fall within this privilege, Mr. Newmyer's act of publicizing the complaint to media organizations immediately after filing does not. Publicizing the complaint was gratuitous and bears no relevance whatsoever to the judicial proceedings. We decline to attach a privilege to such conduct.

Given the particularly sexually explicit language of the complaint and Mr. Newmyer's subsequent use of the complaint to trigger an investigation of Dr. Huntington by the District of Columbia Board of Psychology and the Maryland

---

[15] The RESTATEMENT (SECOND) OF TORTS § 587 provides:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Board of Examiners of Psychologists, we have little difficulty concluding that this conduct "may reasonably be regarded as so extreme and outrageous." *See Drejza, supra*, 650 A.2d at 1316 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h). On the record before us, there is no question that Mr. Newmyer intentionally publicized the civil complaint. We can discern no purpose behind this act other than to brand Dr. Huntington with a scarlet letter by increasing public awareness of the lawsuit.[16] We acknowledge, however, that "reasonable [persons] may differ" and we leave to the jury the task of determining "whether, in the particular case, the conduct has been sufficient[ly] extreme and outrageous to result in liability." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h). Accordingly, we reverse the trial court's grant of summary judgment for Mr. Newmyer as to Dr. Huntington's counterclaim for intentional infliction of emotional distress.

### III. Conclusion

We reverse the trial court's grant of summary judgment as to Dr. Huntington's counterclaims against Mr. Newmyer for tortious interference with Dr. Huntington's business relationships with Sidwell and Wake Kendall and for

---

[16] *Cf.* NATHANIEL HAWTHORNE, THE SCARLET LETTER: A ROMANCE (1850).

intentional infliction of emotional distress, and we remand the case for proceedings consistent with this opinion. In all other aspects, we affirm.[17]

---

[17] Mr. Newmyer also appealed from the trial court's denial of his special motion to dismiss, filed pursuant to the Anti-SLAPP Act, D.C. Code § 16-5502 (a) (2012 Repl.), which authorizes damages pursuant to "any claim arising from an act in furtherance of the right of advocacy on issues of public interest[.]" Such motions protect citizens from "Strategic Lawsuits Against Public Participation" and require the moving party to show "that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest" no later than "45 days after service of the claim." *Id.* The trial court denied Mr. Newmyer's motion as untimely, frivolous, and inapplicable to the current dispute for lack of any issue of public importance.

We affirm the trial court's denial of the motion and award of attorney's fees for two reasons. First, Mr. Newmyer filed his motion on February 29, 2012, more than forty-five days after Dr. Huntington filed his counter-complaint on May 12, 2011. *See* D.C. Code § 16-5502 (a) (placing a forty-five day limit on such claims). Second, Mr. Newmyer failed to establish any issue of public interest. *See* D.C. Code § 16-5501 (3) (2012 Repl.) (stating that an "'[i]ssue of public interest' means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place" and "shall not be construed to include private interests[.]").